PRICE V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO.  2-04-348-CR

ADAM CLAY PRICE APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 90TH DISTRICT COURT OF YOUNG COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I. Introduction

Appellant Adam Clay Price was charged with the offense of intentionally or knowingly causing serious bodily injury to a child by shaking.  A jury convicted him of the lesser included offense of reckless injury to a child, and the trial court sentenced him to fifteen years’ confinement and a $2,500 fine.  In one point, Appellant contends that the evidence is legally and factually insufficient to support his conviction.  We affirm.

II. 
Review of Evidence

On the morning of January 19, 2003, Appellant called 9-1-1 after his three-month-old son stopped breathing.  Bryan Walls, an officer with the Graham Police Department, was dispatched to the residence and was the first officer on the scene.  Officer Walls testified that when he walked in the front door, Appellant handed him the three-month-old baby.  The child had a heartbeat, but was otherwise unresponsive and not breathing.  Officer Walls performed CPR, and the child responded; however, he began stiffening up.  The ambulance had arrived by that time, and Officer Walls gave the baby to the paramedics.  Officer Walls testified that he suspected that the child had head trauma; therefore, he contacted Investigator Charles Parker.  Officer Walls further stated that he did not see anyone else in the residence at the time and that Appellant said that his son had been sick.   

Dr. Gerald Mitchell, an emergency room physician at Graham Regional Medical Center, testified that when paramedics brought the baby into the emergency room that day, he was “in active seizuring, sort of an epileptic type of straightening out, twitching, jerking, not breathing real well, color was not the best.” 
 The doctors started an IV to give the baby medicine, but when he remained unconscious and continued to breathe ineffectively, he was intubated. Dr. Mitchell stated that lab studies showed the baby had a high white blood cell count.  Dr. Mitchell further testified that after the child stabilized, a CAT scan was performed.  

The radiologist reported to Dr. Mitchell that the CAT scan showed “an accumulation of fluid that appeared to him to be blood that was on both sides of the frontal lobes [of the brain].”  Dr. Mitchell stated that when he received the oral report from the radiologist, he wrote down, “Question mark, questionable frontal fluid, questionable old blood,“ indicating that there was very little fresh blood present.  Furthermore, Dr. Mitchell testified that the printed report regarding the CAT scan, which was transcribed and printed later that day, stated:

[B]ilateral large subdural fluid collections are observed about the frontal and the parietal lobes.  This is bilaterally on both sides.  The appearance suggests subacute to chronic subdural hematomas.  Acute hemorrhage is not seen.  The calvarium -- that ‘s the bone -- appears to be intact.  No fractured skull.  Findings would be highly suspicious for child abuse.
(footnote: 2)

Dr. Mitchell also testified, however, that even though the report said that acute hemorrhage was not seen, due to the limitations of the CAT scan, that did not conclusively mean that fresh blood was not present. 
 Dr. Mitchell testified that from his exam of the child, he did not see any bruises, hematomas, lacerations, or evidence of head injury.  He stated that the type of injury was consistent with “blunt head injury” due to either shaken child syndrome, blunt force trauma from a softer object like the side of a hand, or past injuries that could no longer be seen externally.  

Additionally, Dr. Mitchell testified that when he spoke with Appellant and his wife, Appellant told him that the child became angry while feeding, just before the baby stopped breathing.  The parents told Dr. Mitchell they did not know of anything that could have caused trauma to the child, but 
Dr. Mitchell also stated that Appellant admitted “slapping on the legs and shaking the torso of the child” in order to “start him breathing again.”  The child was transported to Cook Children’s Medical Center. 

Dr. Jeffery McGlothlin, a pediatric neurologist who treated the baby when he arrived at Cook Children’s Medical Center and who 
continued to be the treating physician at the time of trial,
(footnote: 3) testified that when the baby first arrived at Cook Children’s, he was contacted to determine whether the baby had had a seizure or if he had been shaken.  Dr. McGlothlin stated that when he initially examined the baby, the baby was “listless and irritable.”  Dr. McGlothlin suspected that the baby had been shaken since the baby had experienced some seizure activity and had gone from “being a normal active child to suddenly being a very sick child.”  

Dr. McGlothlin testified that he watched the baby very closely as the seizures continued over the next few days, despite the baby receiving five different seizure medications.  
A spinal tap revealed that there was blood in the baby’s spinal fluid, indicating that there had been some bleeding in and around the brain.  The baby’s EEG was abnormal, revealing improper electrical activity in the brain that could give rise to seizures.  An MRI revealed excessive amounts of fluid around the brain, which Dr. McGlothlin initially felt did not show any acute hemorrhage.  Furthermore, x-rays revealed an approximately six-week-old fractured rib, indicative of the child being shaken approximately six weeks earlier. 

Ultimately, Dr. McGlothlin testified, “This injury can only be caused by shaken baby syndrome.  In my opinion, there’s nothing else that will cause this injury.”  Dr. McGlothlin stated that the baby had suffered a separation of the brain from the skull, bruising on the brain, and retinal hemorrhaging and that no cause other than shaken baby syndrome would have given the baby these three symptoms together on that day.  
Further, Dr. McGlothlin stated, “My opinion is that the child had been shaken the day that he was brought to Graham Emergency Room and the day that he was then subsequently transferred to Cook Children’s Medical Center.”  Dr. McGlothlin reasoned that, in his opinion, on the morning of January 19, 2003, something happened to make the child change from “fine” to “no longer fine.”  Moreover, he testified that when a child’s brain is injured, he will typically have seizures immediately when he is hurt, and these seizures are very difficult to control; then, once the brain has had a chance to heal, the seizures become more controllable.  Dr. McGlothlin stated that the baby’s seizures in this case were consistent with that pattern. Furthermore, Dr. McGlothlin stated that the many CAT scans that were performed on the baby’s brain supported his opinion.  He testified:

What we did is we did CAT scans over and over again on his brain, and we found that there was actually a very severe injury with the evolution of the CAT scan.  Started out with a normal one indicating that the injury was too soon to be able to detect it and two days later you end up with a CAT scan that looks like he’s had a massive stroke across all the back parts of both sides of the brain and up the right side, and that continues to evolve throughout the course of the studies that we’ve gotten on him, even as late as this past January.

Additionally, Dr. McGlothlin testified that over the course of two or three days, when he would tell Appellant that it was severe shaking that caused his son’s injuries, Appellant would respond by asking what else could have caused the injuries.  Dr. McGlothlin stated that when he would assure Appellant that this was a shaking injury, Appellant would propose alternative possibilities. 

Dr. Eric Packwood, a pediatric ophthalmologist, testified that on January 22, 2003, he examined the child’s eyes, which revealed retinal hemorrhages, “too many to count,” and schesis cavities, indicating separation of layers of the retina.  Dr. Packwood stated that although there are other causes of retinal hemorrhages, shaken baby syndrome is the only cause of retinal schesis with retinal hemorrhage.  Dr. Packwood testified that the earliest the injury could have occurred was approximately six weeks prior to his examination of the child; however, he also stated that if the injury had occurred six weeks prior, he would have expected more healing.  Furthermore, looking at the seriousness of the injury, Dr. Packwood testified that “two weeks [prior to his examination] would be a rough guesstimate” of when the injury occurred, “give or take five days.”  Moreover, Dr. Packwood stated, “My assessment is that [the injury] occurred more recent to my examination.” 

Charles Parker, the investigator for the Graham Police Department, testified that on January 19, 2003, after receiving a call from Officer Walls, he went to the Graham Regional Medical Center emergency room where he interviewed Appellant.  
Investigator Parker recounted at trial what Appellant told him in the initial interview:

[Appellant] stated that his wife had been at work.  He had gotten up [at] approximately 8 o’clock in the morning; taken the baby to the living room to feed him.  Started feeing [sic] him.  The child ate approximately an ounce and a half of cereal.  He got mad, so [Appellant] placed [the baby] on the couch and propped him up.  He started crying so [Appellant] picked him back up; attempted to feed him again.  At that time cereal started running down the corner of the child’s mouth.  He tightened up, straightened up like he was trying to stand up, and his eyes rolled back in the back of his head, or rolled back, and he appeared to quit breathing.

Investigator Parker testified that he did not suspect any wrongdoing at the time; therefore, he stayed at the hospital until the child was transported to Cook Children’s Medical Center and then went home.  

However, Investigator Parker stated that later that day he was contacted by the Young County Sheriff’s Office and advised that he needed to talk to Dr. Mitchell at Graham Regional Medical Center.  During his conversation with Dr. Mitchell, Investigator Parker was informed that the child’s injuries may have been the result of shaken baby syndrome.  Therefore, Investigator Parker went to Cook Children’s Medical Center to interview Appellant and his wife. Investigator Parker testified that when he arrived at Cook Children’s Medical Center, he first spoke with Appellant’s wife.  She stated that on January 19, 2003, she had gone to work at 6:30 a.m.  She had no explanation for why the child was injured except that she said the child had “a bad habit of throwing himself backwards” and that “on one occasion he had quit breathing on his own several weeks prior.”  Investigator Parker then re-interviewed Appellant.  

Appellant stated that his wife had gone to bed early on the night of January 18, 2003, and the baby woke up crying between midnight and 1:00 a.m.  Appellant thought the child was sick, so he gave him children’s Tylenol. Then, around 8:00 a.m. the next morning, January 19, 2003, Appellant took the baby to the living room and started to feed him.  Appellant admitted that he was there with the child alone.  The child ate about an ounce and a half of cereal before he “got mad.”  Appellant sat the baby on the couch, but he started to cry; therefore, Appellant picked the child up and tried to feed him again.  The “cereal was running down the corner of his mouth, and that’s when he tightened up and tried to stand up.”  The baby appeared to stop breathing, and “his eyes rolled back.”  Investigator Parker testified that Appellant told him that when the child stopped breathing:

He explained that he had blown in the baby’s face; had slapped him on the thigh and had shaken him.  And I asked him how hard he shook him, and the best of my knowledge he said wasn’t very hard.  And I asked him how were you holding him, and he held his hands up like this with his little fingers together, stated that the baby’s head was laying in his hands resting against his fingers like this.  And I asked him how hard he shook him, and he said not very hard.  And I asked him, Well, did you feel his head move in your hand, and he said yes.  And I said, Did you feel his head slapping your fingers as you were shaking him, and he said, Yes, sir, I did.

Investigator Parker stated that Appellant then called 9-1-1.  However, Investigator Parker also testified that Appellant stated on another occasion that he had called his wife before he called 9-1-1, which in Investigator Parker’s experience is consistent with shaken baby cases.  

Investigator Parker stated that he then asked Appellant whether he was aware that the baby had a fractured rib.  Appellant responded that the doctors had told him about it.  Investigator Parker asked Appellant how it could have happened, and Investigator Parker testified that Appellant responded as follows:

Well, one time we were home and we were in the living room and [the baby] was sitting on the couch, propped up on the couch.  And he was crying.  No matter what we did we couldn’t get him to stop.  And he stated that sometimes when I lose control of the situation, I become frustrated.  When I don’t know how to handle the situation, I got mad.  And he said, I got mad.  And he said, I just grabbed him off the couch and that if he was going to act like that then he could do it in his bed.  So he then took him and placed him in his bed, and when he turned around he noticed his wife was looking at him and she had a real scared look on her face like she was afraid that he was going to hurt the baby.

Investigator Parker testified that Appellant explained that the child had never been involved in an accident or had any illnesses, except that he had been “colicky” on several occasions.    

Dr. Sridhar Natarajan, the Chief Medical Examiner for Lubbock County, testified that although he never personally examined the child, he reviewed all of the baby’s medical records, and the records indicate that there was a “chronic subdural effusion” present but nothing to indicate an acute hemorrhage.
(footnote: 4)  Dr. Natarajan further stated that from the medical records that he reviewed, he did not see any indication that the bleeding in the child’s brain took place on the day the baby was admitted to the hospital.  However, Dr. Natarajan also testified that he was not discounting that the child could have been shaken on the day he was admitted to the hospital.  He stated that a baby could be violently shaken without the presence of an acute hemorrhage.  Furthermore, Dr. Natarajan consistently deferred to the judgment of the treating physicians.   

Roger Price, Appellant’s father, testified that he had never seen Appellant be abusive to the child.  Mr. Price stated that even though the baby cried some, he never observed Appellant lose his temper or become angry with the child. Furthermore, Mr. Price testified that prior to January 19, 2003, he had observed the child “stiffen a little bit.”  However, Mr. Price also stated that he works offshore; therefore, he would be gone for two weeks at a time. 

Jason Price, Appellant’s brother, testified that Appellant was a caring father, and he never saw Appellant lose his temper with the child even though the baby was “fussy at times.” 

Alexia Price, Appellant’s wife, testified that a couple of months after the baby was born, he began to “scream constantly” for one to two hours even though she and Appellant would try to calm him down.  Mrs. Price further stated that a number of individuals cared for the baby, including the child’s grandparents, an aunt, a babysitter, and a friend of the family. 
 Regarding the incident that Investigator Parker described of Appellant “grabbing” the child off the couch, Mrs. Price stated:

[Appellant] was holding [the baby], and he got up fast, but he had ahold of him. He was cradling him.  And just from how fast he got up, I had an expression on my face that, I mean, it was just kind of shocking at how fast he got up from the couch.

Finally, Mrs. Price testified that on January 19, 2003, Appellant had been home for about a week to ten days, and during that time period, he was the primary caregiver for the child.  On that morning, Appellant called her and told her that the child had stopped breathing; therefore, he had called 9-1-1.  Appellant had tried to get the baby to start breathing by blowing in his face and tapping his leg.  Mrs. Price stated that she had never observed Appellant being abusive to anyone. 

III. Legal and Factual Sufficiency Standards

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to 
the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).
  
This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).
  The standard of review is the same for direct and circumstantial evidence cases.  
Burden v. State
, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); 
Kutzner v. State
, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) when the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment and, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
.   In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).
  
A factual sufficiency review of circumstantial evidence is the same as a review of direct evidence.  
King v. State
, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000); 
Kutzner
, 994 S.W.2d at 184.

IV. Elements of Offense

Injury to a child is a result-oriented offense.  
Alvarado v. State
, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985); 
Bowden v. State
, 166 S.W.3d 466, 470 (Tex. App.—Fort Worth 2005, pet. ref’d).  Thus, it is not enough for the State to prove that the defendant engaged in the conduct with the requisite criminal intent; instead, the State must also prove that the defendant caused the result with the requisite criminal intent.  
Bowden
, 166 S.W.3d at 470;
 Lee v. State
, 21 S.W.3d 532, 540 (Tex. App.—Tyler 2000, pet. ref’d).  A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.  
Tex. Penal Code Ann.
 § 6.04(a) (Vernon 2003).

Here, Appellant was found guilty of reckless injury to a child.  A person acts recklessly when he is aware of, but consciously disregards, a substantial and unjustifiable risk that the result will occur.  
Id
. § 6.03(c).  The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor’s standpoint.  
Id
.  Reckless conduct involves conscious risk creation; that is, the actor was aware of the risk surrounding his conduct or the result of his conduct, but consciously disregarded that risk.  
See Lewis v. State
, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975).  The culpable mental state is generally proven through circumstantial evidence.  
See Dillon v. State
, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978).  

V. Analysis

Appellant specifically contends that the evidence is legally and factually insufficient to support his conviction because the State failed to prove beyond a reasonable doubt that Appellant was the perpetrator of the offense.  Appellant points to the medical evidence, which he argues “showed, within a reasonable degree of medical probability that the injury or injuries, which caused the symptoms, which manifested on January 19, 2003, occurred several weeks prior to January 19, 2003.” 
 

Viewed in the light most favorable to the verdict, 
the evidence in this case shows the following:  (1) 
Appellant was alone with the child on the morning the baby had to be taken to the hospital; (2) Appellant admitted to Dr. Mitchell that he slapped on the legs and shook the torso of the child in order to “start him breathing again;” (3) Dr. McGlothlin and Dr. Packwood concluded that the child’s injuries could only have been caused by shaken baby syndrome; and (4) even though there was some evidence to the contrary, Dr. McGlothlin stated that, in his opinion, the child was shaken on the day he was brought to the hospital because, among other things, on the morning that the baby had to be taken to the hospital, something happened to make the child change from “fine” to “no longer fine.”
 
 
 

We conclude that a rational juror could have found that Appellant caused the baby’s injuries.  Mere presence of the accused at the scene of an offense is insufficient to support a conviction.  
Pickering v. State
, 596 S.W.2d 124, 129 (Tex. Crim. App. 1980).  However, an accused’s presence at the scene is a circumstance that tends to prove guilt and, when combined with other facts, may indeed show the accused to be guilty of the crime.  
Wright v. State
, 603 S.W.2d 838, 840-41 (Tex. Crim. App. 1980) (op. on reh’g).  Therefore, we hold that the evidence is legally sufficient to show that Appellant caused the child’s injuries.  
See Bryant v. State
, 909 S.W.2d 579, 583 (Tex. App.—Tyler 1995, no writ) (holding evidence legally sufficient to support appellant’s conviction of aggravated injury to a child when the child’s mother left her in appellant’s care around 5:00 p.m. in a healthy condition, appellant took the severely injured child to the emergency room at around 9:00 p.m., and examining physicians agreed that the child’s injuries were consistent with trauma incurred within thirty minutes of when she was in the emergency room); 
Sandow v. State
, 787 S.W.2d 588, 598-99 (Tex. App.—Austin 1990, writ ref’d) (holding evidence legally sufficient to show beyond a reasonable doubt that appellant injured the child when evidence did not give rise to a reasonable inference that someone other than appellant caused serious bodily injury to the victim).
 

We next turn to the factual sufficiency of the evidence.
  
The evidence shows that on the morning of January 19, 2003, while Appellant was alone with the child, the baby became angry while feeding, just before he stopped breathing
. 
 Appellant stated to both Dr. Mitchell and Investigator Parker that he blew in the baby’s face, slapped the baby on the legs, and shook the child to “start him breathing again.” 

Several doctors presented extensive medical evidence.  Dr. Mitchell, the emergency room physician who first examined and treated the child, testified that the initial CAT scan performed on the baby showed no evidence of acute (recent) hemorrhage; however, he also stated that due to the limitations of the CAT scan, fresh blood might have been present even though an acute hemorrhage was not seen.  Further, Dr. Mitchell testified that from his exam of the child, he did not see any bruises, hematomas, lacerations, or evidence of head injury.  He stated that the type of injury was consistent with “blunt head injury” due to either shaken child syndrome, blunt force trauma from a softer object like the side of a hand, or past injuries that could no longer be seen externally. 
 

Dr. McGlothlin, the pediatric neurologist who treated the child when he arrived at Cook Children’s Medical Center and who was continuing to treat the child at the time of trial, testified that the child’s injury could only be caused by shaken baby syndrome, and that, in his opinion, the child had been shaken on the day he was taken to the hospital.  Dr. McGlothlin provided essentially three reasons to support his opinion:  (1) on the morning of January 19, 2003, something had to have happened to make the child change from “fine” to “no longer fine;” (2) 
when a child’s brain is injured, he will typically have seizures immediately when he is hurt, and these seizures are very difficult to control; then, once the brain has had a chance to heal, the seizures become more controllable, which was the case here ; and (3) the many CAT scans that were performed on the baby’s brain showed the progression of his injury, which was consistent with the baby having been shaken on the day he was taken to the hospital
.  

Dr. Packwood, a pediatric ophthalmologist who examined the child at Cook Children’s Medical Center, testified that shaken baby syndrome was the only possible cause of the baby’s injuries; however, he gave varying dates for when the injury could have occurred.  He stated that the earliest the injury could have occurred was six weeks prior to his examination of the child, but looking at the seriousness of the injury, it probably occurred two weeks prior to his examination, “give or take five days.”  He also stated, “My assessment is that [the injury] occurred more recent to my examination.”  

Finally, Dr. Natarajan, who reviewed the child’s medical records but never personally examined the child, testified that nothing in the child’s medical records indicated that the bleeding in the child’s brain took place on the day the baby was admitted to the hospital; however, Dr. Natarajan also stated that he was not discounting that the child could have been shaken on the day he was admitted to the hospital because a child can be violently shaken without the presence of an acute hemorrhage. 

Finally, although Appellant presented testimony from his father, brother, and wife that he had never been abusive to the child in their presence, the State presented evidence of a previous incident in which Appellant handled the baby roughly.  Investigator Parker testified that when he asked Appellant about the child’s fractured rib, Appellant responded that on one occasion, he had gotten mad because the child kept crying; therefore, he had “grabbed” the baby off the couch and taken him to his bed.   

In light of the foregoing, we cannot 
say that, after weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt. 
 See Zuniga
, 144 S.W.3d at 484-85
.  Viewing all the evidence in a neutral light, we hold that 
the evidence is factually sufficient to show that Appellant caused the child’s injuries.
  
See Courson v. State
, 160 S.W.3d 125, 127-28 (Tex. App.—Fort Worth 2005, no. pet.) (holding evidence legally and factually sufficient to support appellant’s conviction for causing injury to a child with a deadly weapon when the State presented evidence from doctors that the child suffered a traumatic event in the twenty-four-hour period before appellant brought her to the hospital and the evidence showed appellant was the child’s primary caregiver during that twenty-four-hour period)
; see also Carlson v. State
, No. 01-04-00880-CR, 2005 WL 3315252, at *4-5 (Tex. App.—Houston [1st
 Dist.] Dec. 8, 2005, no pet.) (not designated for publication) (holding evidence factually sufficient to show appellant caused child’s injuries when physicians testified that the symptoms of the child’s type of injury would typically occur within a short period of time after the injury was inflicted, appellant was twice found alone with the child during the twenty-four-hour period before the child was taken to the hospital, the State presented evidence showing appellant had previously handled the child roughly
, and the State presented evidence that appellant reacted unusually to his son’s diagnosis)
. 
 
We overrule Appellant’s sole point.

VI. Conclusion

Having overruled Appellant’s point, we affirm the trial court’s judgment.

PER CURIAM

PANEL F: GARDNER, LIVINGSTON, and DAUPHINOT, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: March 2, 2006

FOOTNOTES
1:
See 
Tex. R. App. P. 
47.4.

2:
Dr. Mitchell testified that “acute” means fresh blood, “subacute” means blood that may have been there for two to five weeks and is in the process of being absorbed and reutilized by the body, and “chronic” means blood that has been there for a few weeks or one to two months.  

3:
At the time of trial, the child was almost two years old.  Dr. McGlothlin testified that although he had recovered significantly, he has epilepsy and cerebral palsy, resulting directly from the injury.  Dr. McGlothlin also stated that, at the time of trial, the child was delayed in his development, had difficulty moving the left side of his body, and continued to have occasional seizures. 

4:
Dr. Natarajan explained:  “For my purposes when we’re looking at acute, we’re saying probably less than seven days; subacute depending on which text you use can be one to two weeks to three weeks; and then chronic can be more than two to three weeks in age.”