COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.  2-04-348-CR

 

 

ADAM CLAY PRICE                                                             APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

              FROM
THE 90TH DISTRICT COURT OF YOUNG COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I.      Introduction








Appellant Adam Clay Price was
charged with the offense of intentionally or knowingly causing serious bodily
injury to a child by shaking.  A jury
convicted him of the lesser included offense of reckless injury to a child, and
the trial court sentenced him to fifteen years= confinement and a $2,500 fine. 
In one point, Appellant contends that the evidence is legally and
factually insufficient to support his conviction.  We affirm.

II.     Review
of Evidence

On the morning of January 19,
2003, Appellant called 9-1-1 after his three-month-old son stopped
breathing.  Bryan Walls, an officer with
the Graham Police Department, was dispatched to the residence and was the first
officer on the scene.  Officer Walls
testified that when he walked in the front door, Appellant handed him the
three-month-old baby.  The child had a
heartbeat, but was otherwise unresponsive and not breathing.  Officer Walls performed CPR, and the child
responded; however, he began stiffening up. 
The ambulance had arrived by that time, and Officer Walls gave the baby
to the paramedics.  Officer Walls
testified that he suspected that the child had head trauma; therefore, he
contacted Investigator Charles Parker. 
Officer Walls further stated that he did not see anyone else in the
residence at the time and that Appellant said that his son had been sick.   








Dr. Gerald Mitchell, an
emergency room physician at Graham Regional Medical Center, testified that when
paramedics brought the baby into the emergency room that day, he was Ain active seizuring, sort of an epileptic type of straightening out,
twitching, jerking, not breathing real well, color was not the best.@  The doctors started an IV to
give the baby medicine, but when he remained unconscious and continued to
breathe ineffectively, he was intubated. Dr. Mitchell stated that lab studies
showed the baby had a high white blood cell count.  Dr. Mitchell further testified that after the
child stabilized, a CAT scan was performed. 


The radiologist reported to
Dr. Mitchell that the CAT scan showed Aan accumulation of fluid that appeared to him to be blood that was on
both sides of the frontal lobes [of the brain].@  Dr. Mitchell stated that when
he received the oral report from the radiologist, he wrote down, AQuestion mark, questionable frontal fluid, questionable old blood,A indicating that there was very little fresh blood present.  Furthermore, Dr. Mitchell testified that the
printed report regarding the CAT scan, which was transcribed and printed later
that day, stated:

[B]ilateral large subdural fluid collections are observed about the
frontal and the parietal lobes.  This is
bilaterally on both sides.  The
appearance suggests subacute to chronic subdural hematomas.  Acute hemorrhage is not seen.  The calvarium -- that >s the
bone -- appears to be intact.  No
fractured skull.  Findings would be
highly suspicious for child abuse.[2]

 








Dr. Mitchell also testified,
however, that even though the report said that acute hemorrhage was not seen,
due to the limitations of the CAT scan, that did not conclusively mean that
fresh blood was not present.  Dr.
Mitchell testified that from his exam of the child, he did not see any bruises,
hematomas, lacerations, or evidence of head injury.  He stated that the type of injury was
consistent with Ablunt head
injury@ due to either shaken child syndrome, blunt force trauma from a softer
object like the side of a hand, or past injuries that could no longer be seen
externally.  

Additionally,
Dr. Mitchell testified that when he spoke with Appellant and his wife,
Appellant told him that the child became angry while feeding, just before the
baby stopped breathing.  The parents told
Dr. Mitchell they did not know of anything that could have caused trauma to the
child, but Dr. Mitchell also stated that Appellant admitted Aslapping on the legs and shaking the torso of the child@ in order to Astart him
breathing again.@  The child was transported to Cook Children=s Medical Center. 








Dr. Jeffery
McGlothlin, a pediatric neurologist who treated the baby when he arrived at
Cook Children=s Medical
Center and who continued to be the treating physician at the time of trial,[3]
testified that when the baby first arrived at Cook Children=s, he was contacted to determine whether the baby had had a seizure or
if he had been shaken.  Dr. McGlothlin
stated that when he initially examined the baby, the baby was Alistless and irritable.@  Dr. McGlothlin suspected that
the baby had been shaken since the baby had experienced some seizure activity
and had gone from Abeing a
normal active child to suddenly being a very sick child.@  

Dr.
McGlothlin testified that he watched the baby very closely as the seizures
continued over the next few days, despite the baby receiving five different seizure
medications.  A spinal tap revealed that
there was blood in the baby=s spinal fluid, indicating that there had been some bleeding in and
around the brain.  The baby=s EEG was abnormal, revealing improper electrical activity in the
brain that could give rise to seizures. 
An MRI revealed excessive amounts of fluid around the brain, which Dr.
McGlothlin initially felt did not show any acute hemorrhage.  Furthermore, x-rays revealed an approximately
six-week-old fractured rib, indicative of the child being shaken approximately
six weeks earlier. 








Ultimately,
Dr. McGlothlin testified, AThis injury can only be caused by shaken baby syndrome.  In my opinion, there=s nothing else that will cause this injury.@  Dr. McGlothlin stated that the
baby had suffered a separation of the brain from the skull, bruising on the
brain, and retinal hemorrhaging and that no cause other than shaken baby
syndrome would have given the baby these three symptoms together on that
day.  Further, Dr. McGlothlin stated, AMy opinion is that the child had been shaken the day that he was
brought to Graham Emergency Room and the day that he was then subsequently
transferred to Cook Children=s Medical Center.@  Dr. McGlothlin reasoned that,
in his opinion, on the morning of January 19, 2003, something happened to make
the child change from Afine@ to Ano longer fine.@  Moreover, he testified that
when a child=s brain is
injured, he will typically have seizures immediately when he is hurt, and these
seizures are very difficult to control; then, once the brain has had a chance
to heal, the seizures become more controllable. 
Dr. McGlothlin stated that the baby=s seizures in this case were consistent with that pattern.
Furthermore, Dr. McGlothlin stated that the many CAT scans that were performed
on the baby=s brain
supported his opinion.  He testified:

What we did is we did CAT scans over and over again on his brain, and
we found that there was actually a very severe injury with the evolution of the
CAT scan.  Started out with a normal one
indicating that the injury was too soon to be able to detect it and two days
later you end up with a CAT scan that looks like he=s had
a massive stroke across all the back parts of both sides of the brain and up
the right side, and that continues to evolve throughout the course of the
studies that we=ve
gotten on him, even as late as this past January.

 








Additionally,
Dr. McGlothlin testified that over the course of two or three days, when he
would tell Appellant that it was severe shaking that caused his son=s injuries, Appellant would respond by asking what else could have
caused the injuries.  Dr. McGlothlin
stated that when he would assure Appellant that this was a shaking injury,
Appellant would propose alternative possibilities. 

Dr. Eric
Packwood, a pediatric ophthalmologist, testified that on January 22, 2003, he
examined the child=s eyes,
which revealed retinal hemorrhages, Atoo many to count,@ and schesis cavities, indicating separation of layers of the
retina.  Dr. Packwood stated that
although there are other causes of retinal hemorrhages, shaken baby syndrome is
the only cause of retinal schesis with retinal hemorrhage.  Dr. Packwood testified that the earliest the
injury could have occurred was approximately six weeks prior to his examination
of the child; however, he also stated that if the injury had occurred six weeks
prior, he would have expected more healing. 
Furthermore, looking at the seriousness of the injury, Dr. Packwood
testified that Atwo weeks
[prior to his examination] would be a rough guesstimate@ of when the injury occurred, Agive or take five days.@  Moreover, Dr. Packwood stated,
AMy assessment is that [the injury] occurred more recent to my
examination.@ 








Charles
Parker, the investigator for the Graham Police Department, testified that on
January 19, 2003, after receiving a call from Officer Walls, he went to the
Graham Regional Medical Center emergency room where he interviewed
Appellant.  Investigator Parker recounted
at trial what Appellant told him in the initial interview:

[Appellant] stated that his wife had been at work.  He had gotten up [at] approximately 8 o=clock
in the morning; taken the baby to the living room to feed him.  Started feeing [sic] him.  The child ate approximately an ounce and a
half of cereal.  He got mad, so
[Appellant] placed [the baby] on the couch and propped him up.  He started crying so [Appellant] picked him
back up; attempted to feed him again.  At
that time cereal started running down the corner of the child=s
mouth.  He tightened up, straightened up
like he was trying to stand up, and his eyes rolled back in the back of his
head, or rolled back, and he appeared to quit breathing.

 

Investigator Parker testified
that he did not suspect any wrongdoing at the time; therefore, he stayed at the
hospital until the child was transported to Cook Children=s Medical Center and then went home. 









However,
Investigator Parker stated that later that day he was contacted by the Young
County Sheriff=s Office and
advised that he needed to talk to Dr. Mitchell at Graham Regional Medical
Center.  During his conversation with Dr.
Mitchell, Investigator Parker was informed that the child=s injuries may have been the result of shaken baby syndrome.  Therefore, Investigator Parker went to Cook
Children=s Medical Center to interview Appellant and his wife. Investigator Parker testified that when he
arrived at Cook Children=s Medical
Center, he first spoke with Appellant=s wife.  She stated that on
January 19, 2003, she had gone to work at 6:30 a.m.  She had no explanation for why the child was
injured except that she said the child had Aa bad habit of throwing himself backwards@ and that Aon one
occasion he had quit breathing on his own several weeks prior.@  Investigator Parker then
re-interviewed Appellant.  

Appellant
stated that his wife had gone to bed early on the night of January 18, 2003,
and the baby woke up crying between midnight and 1:00 a.m.  Appellant thought the child was sick, so he
gave him children=s Tylenol.
Then, around 8:00 a.m. the next morning, January 19, 2003, Appellant took the
baby to the living room and started to feed him.  Appellant admitted that he was there with the
child alone.  The child ate about an
ounce and a half of cereal before he Agot mad.@  Appellant sat the baby on the couch, but he
started to cry; therefore, Appellant picked the child up and tried to feed him
again.  The Acereal was running down the corner of his mouth, and that=s when he tightened up and tried to stand up.@  The baby appeared to stop
breathing, and Ahis eyes
rolled back.@  Investigator Parker testified that Appellant
told him that when the child stopped breathing:

He explained that he had blown in the baby=s
face; had slapped him on the thigh and had shaken him.  And I asked him how hard he shook him, and
the best of my knowledge he said wasn=t very hard.  And I asked him how were you holding him, and
he held his hands up like this with his little fingers together, stated that
the baby=s
head was laying in his hands resting against his fingers like this.  And I asked him how hard he shook him, and he
said not very hard.  And I asked him,
Well, did you feel his head move in your hand, and he said yes.  And I said, Did you feel his head slapping
your fingers as you were shaking him, and he said, Yes, sir, I did.








Investigator Parker stated
that Appellant then called 9-1-1. 
However, Investigator Parker also testified that Appellant stated on
another occasion that he had called his wife before he called 9-1-1, which in
Investigator Parker=s experience
is consistent with shaken baby cases.  

Investigator
Parker stated that he then asked Appellant whether he was aware that the baby
had a fractured rib.  Appellant responded
that the doctors had told him about it. 
Investigator Parker asked Appellant how it could have happened, and
Investigator Parker testified that Appellant responded as follows:

Well, one time we were home and we were in the living room and [the
baby] was sitting on the couch, propped up on the couch.  And he was crying.  No matter what we did we couldn=t get
him to stop.  And he stated that
sometimes when I lose control of the situation, I become frustrated.  When I don=t know how to handle the
situation, I got mad.  And he said, I got
mad.  And he said, I just grabbed him off
the couch and that if he was going to act like that then he could do it in his
bed.  So he then took him and placed him
in his bed, and when he turned around he noticed his wife was looking at him and
she had a real scared look on her face like she was afraid that he was going to
hurt the baby.

 

Investigator Parker testified
that Appellant explained that the child had never been involved in an accident
or had any illnesses, except that he had been Acolicky@ on several
occasions.    








Dr. Sridhar
Natarajan, the Chief Medical Examiner for Lubbock County, testified that
although he never personally examined the child, he reviewed all of the baby=s medical records, and the records indicate that there was a Achronic subdural effusion@ present but nothing to indicate an acute hemorrhage.[4]  Dr. Natarajan further stated that from the
medical records that he reviewed, he did not see any indication that the
bleeding in the child=s brain took
place on the day the baby was admitted to the hospital.  However, Dr. Natarajan also testified that he
was not discounting that the child could have been shaken on the day he was
admitted to the hospital.  He stated that
a baby could be violently shaken without the presence of an acute
hemorrhage.  Furthermore, Dr. Natarajan
consistently deferred to the judgment of the treating physicians.   

Roger Price,
Appellant=s father,
testified that he had never seen Appellant be abusive to the child.  Mr. Price stated that even though the baby
cried some, he never observed Appellant lose his temper or become angry with
the child. Furthermore, Mr. Price testified that prior to January 19, 2003, he
had observed the child Astiffen a
little bit.@  However, Mr. Price also stated that he works
offshore; therefore, he would be gone for two weeks at a time. 








Jason Price,
Appellant=s brother,
testified that Appellant was a caring father, and he never saw Appellant lose
his temper with the child even though the baby was Afussy at times.@ 

Alexia
Price, Appellant=s wife,
testified that a couple of months after the baby was born, he began to Ascream constantly@ for one to two hours even though she and Appellant would try to calm
him down.  Mrs. Price further stated that
a number of individuals cared for the baby, including the child=s grandparents, an aunt, a babysitter, and a friend of the
family.  Regarding the incident that
Investigator Parker described of Appellant Agrabbing@ the child
off the couch, Mrs. Price stated:

[Appellant] was holding [the baby], and he got up fast, but he had
ahold of him. He was cradling him.  And
just from how fast he got up, I had an expression on my face that, I mean, it
was just kind of shocking at how fast he got up from the couch.

 

Finally, Mrs. Price testified
that on January 19, 2003, Appellant had been home for about a week to ten days,
and during that time period, he was the primary caregiver for the child.  On that morning, Appellant called her and
told her that the child had stopped breathing; therefore, he had called
9-1-1.  Appellant had tried to get the
baby to start breathing by blowing in his face and tapping his leg.  Mrs. Price stated that she had never observed
Appellant being abusive to anyone. 

III.     Legal
and Factual Sufficiency Standards








In reviewing
the legal sufficiency of the evidence to support a conviction, we view all the
evidence in the light most favorable to the verdict in order to determine
whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v.
State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  This
standard gives full play to the responsibility of the trier of fact to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts. 
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the
weight and credibility of the evidence.  See Tex. Code Crim. Proc. Ann. art. 38.04
(Vernon 1979); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App.
2000).  Thus, when performing a legal
sufficiency review, we may not re-evaluate the weight and credibility of the
evidence and substitute our judgment for that of the fact finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the
evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  The standard of review is the same for direct
and circumstantial evidence cases.  Burden
v. State, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); Kutzner v. State,
994 S.W.2d 180, 184 (Tex. Crim. App. 1999).













In reviewing
the factual sufficiency of the evidence to support a conviction, we are to view
all the evidence in a neutral light, favoring neither party.  See Zuniga v. State, 144 S.W.3d 477,
481 (Tex. Crim. App. 2004).  The only
question to be answered in a factual sufficiency review is whether, considering
the evidence in a neutral light, the fact finder was rationally justified in
finding guilt beyond a reasonable doubt. 
Id. at 484.  There are two
ways evidence may be factually insufficient: 
(1) when the evidence supporting the verdict or judgment, considered by
itself, is too weak to support the finding of guilt beyond a reasonable doubt;
or (2) when there is evidence both supporting and contradicting the verdict or
judgment and, weighing all of the evidence, the contrary evidence is so strong
that guilt cannot be proven beyond a reasonable doubt.  Id. at 484-85.  AThis standard acknowledges that evidence of guilt can >preponderate= in favor of
conviction but still be insufficient to prove the elements of the crime beyond
a reasonable doubt.@  Id. at 485.  In other words, evidence supporting a guilty
finding can outweigh the contrary proof but still be insufficient to prove the
elements of an offense beyond a reasonable doubt.  Id. 
 In performing a factual
sufficiency review, we are to give deference to the fact finder=s determinations, including determinations involving the credibility
and demeanor of witnesses.  Id. at
481; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the
fact finder=s.  Zuniga, 144 S.W.3d at 482.  

A proper
factual sufficiency review requires an examination of all the evidence.  Id. at 484, 486-87.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that
supports the appellant=s complaint
on appeal.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003).  A factual sufficiency review of
circumstantial evidence is the same as a review of direct evidence.  King v. State, 29 S.W.3d 556, 565
(Tex. Crim. App. 2000); Kutzner, 994 S.W.2d at 184.

IV.    Elements
of Offense








Injury to a
child is a result-oriented offense.  Alvarado
v. State, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985); Bowden v. State,
166 S.W.3d 466, 470 (Tex. App.CFort Worth 2005, pet. ref=d).  Thus, it is not enough for
the State to prove that the defendant engaged in the conduct with the requisite
criminal intent; instead, the State must also prove that the defendant caused
the result with the requisite criminal intent. 
Bowden, 166 S.W.3d at 470; Lee v. State, 21 S.W.3d 532,
540 (Tex. App.CTyler 2000,
pet. ref=d).  A person is criminally
responsible if the result would not have occurred but for his conduct, operating
either alone or concurrently with another cause, unless the concurrent cause
was clearly sufficient to produce the result and the conduct of the actor
clearly insufficient.  Tex. Penal Code Ann. ' 6.04(a) (Vernon 2003).

Here,
Appellant was found guilty of reckless injury to a child.  A person acts recklessly when he is aware of,
but consciously disregards, a substantial and unjustifiable risk that the
result will occur.  Id. ' 6.03(c).  The risk must be of
such a nature and degree that its disregard constitutes a gross deviation from
the standard of care that an ordinary person would exercise under all the
circumstances as viewed from the actor=s standpoint.  Id.  Reckless conduct involves conscious risk
creation; that is, the actor was aware of the risk surrounding his conduct or
the result of his conduct, but consciously disregarded that risk.  See Lewis v. State, 529 S.W.2d 550,
553 (Tex. Crim. App. 1975).  The culpable
mental state is generally proven through circumstantial evidence.  See Dillon v. State, 574 S.W.2d 92, 94
(Tex. Crim. App. [Panel Op.] 1978).  

V.     Analysis








Appellant
specifically contends that the evidence is legally and factually insufficient
to support his conviction because the State failed to prove beyond a reasonable
doubt that Appellant was the perpetrator of the offense.  Appellant points to the medical evidence,
which he argues Ashowed,
within a reasonable degree of medical probability that the injury or injuries,
which caused the symptoms, which manifested on January 19, 2003, occurred
several weeks prior to January 19, 2003.@  

Viewed in
the light most favorable to the verdict, the evidence in this case shows the
following:  (1) Appellant was alone with
the child on the morning the baby had to be taken to the hospital; (2)
Appellant admitted to Dr. Mitchell that he slapped on the legs and shook the
torso of the child in order to Astart him breathing again;@ (3) Dr. McGlothlin and Dr. Packwood concluded that the child=s injuries could only have been caused by shaken baby syndrome; and
(4) even though there was some evidence to the contrary, Dr. McGlothlin stated
that, in his opinion, the child was shaken on the day he was brought to the
hospital because, among other things, on the morning that the baby had to be
taken to the hospital, something happened to make the child change from Afine@ to Ano longer fine.@   








We conclude
that a rational juror could have found that Appellant caused the baby=s injuries.  Mere presence of
the accused at the scene of an offense is insufficient to support a
conviction.  Pickering v. State,
596 S.W.2d 124, 129 (Tex. Crim. App. 1980). 
However, an accused=s presence at the scene is a circumstance that tends to prove guilt
and, when combined with other facts, may indeed show the accused to be guilty
of the crime.  Wright v. State,
603 S.W.2d 838, 840-41 (Tex. Crim. App. 1980) (op. on reh=g).  Therefore, we hold that the
evidence is legally sufficient to show that Appellant caused the child=s injuries.  See Bryant v.
State, 909 S.W.2d 579, 583 (Tex. App.CTyler 1995, no writ) (holding evidence legally sufficient to support
appellant=s conviction
of aggravated injury to a child when the child=s mother left her in appellant=s care around 5:00 p.m. in a healthy condition, appellant took the
severely injured child to the emergency room at around 9:00 p.m., and examining
physicians agreed that the child=s injuries were consistent with trauma incurred within thirty minutes
of when she was in the emergency room); Sandow v. State, 787 S.W.2d 588,
598-99 (Tex. App.CAustin 1990,
writ ref=d) (holding evidence legally sufficient to show beyond a reasonable
doubt that appellant injured the child when evidence did not give rise to a
reasonable inference that someone other than appellant caused serious bodily
injury to the victim).  

We next turn
to the factual sufficiency of the evidence.  The evidence shows that on the
morning of January 19, 2003, while Appellant was alone with the child, the baby
became angry while feeding, just before he stopped breathing.  Appellant stated to both Dr. Mitchell and
Investigator Parker that he blew in the baby=s face, slapped the baby on the legs, and shook the child to Astart him breathing again.@ 








Several
doctors presented extensive medical evidence. 
Dr. Mitchell, the emergency room physician who first examined and
treated the child, testified that the initial CAT scan performed on the baby
showed no evidence of acute (recent) hemorrhage; however, he also stated that
due to the limitations of the CAT scan, fresh blood might have been present
even though an acute hemorrhage was not seen. 
Further, Dr. Mitchell testified that from his exam of the child, he did
not see any bruises, hematomas, lacerations, or evidence of head injury.  He stated that the type of injury was
consistent with Ablunt head
injury@ due to either shaken child syndrome, blunt force trauma from a softer
object like the side of a hand, or past injuries that could no longer be seen
externally.  








Dr.
McGlothlin, the pediatric neurologist who treated the child when he arrived at
Cook Children=s Medical
Center and who was continuing to treat the child at the time of trial,
testified that the child=s injury
could only be caused by shaken baby syndrome, and that, in his opinion, the
child had been shaken on the day he was taken to the hospital.  Dr. McGlothlin provided essentially three
reasons to support his opinion:  (1) on
the morning of January 19, 2003, something had to have happened to make the
child change from Afine@ to Ano longer
fine;@ (2) when a child=s brain is injured, he will typically have seizures immediately when
he is hurt, and these seizures are very difficult to control; then, once the
brain has had a chance to heal, the seizures become more controllable, which
was the case here ; and (3) the many CAT scans that were performed on the baby=s brain showed the progression of his injury, which was consistent
with the baby having been shaken on the day he was taken to the hospital.  

Dr.
Packwood, a pediatric ophthalmologist who examined the child at Cook Children=s Medical Center, testified that shaken baby syndrome was the only
possible cause of the baby=s injuries; however, he gave varying dates for when the injury could
have occurred.  He stated that the
earliest the injury could have occurred was six weeks prior to his examination
of the child, but looking at the seriousness of the injury, it probably
occurred two weeks prior to his examination, Agive or take five days.@  He also stated, AMy assessment is that [the injury] occurred more recent to my
examination.@  

Finally, Dr.
Natarajan, who reviewed the child=s medical records but never personally examined the child, testified
that nothing in the child=s medical
records indicated that the bleeding in the child=s brain took place on the day the baby was admitted to the hospital;
however, Dr. Natarajan also stated that he was not discounting that the child
could have been shaken on the day he was admitted to the hospital because a
child can be violently shaken without the presence of an acute hemorrhage. 








Finally,
although Appellant presented testimony from his father, brother, and wife that
he had never been abusive to the child in their presence, the State presented
evidence of a previous incident in which Appellant handled the baby
roughly.  Investigator Parker testified
that when he asked Appellant about the child=s fractured rib, Appellant responded that on one occasion, he had
gotten mad because the child kept crying; therefore, he had Agrabbed@ the baby
off the couch and taken him to his bed.   








In light of
the foregoing, we cannot say that, after weighing all of the evidence, the
contrary evidence is so strong that guilt cannot be proven beyond a reasonable
doubt.  See Zuniga, 144 S.W.3d at
484-85.  Viewing all the evidence in a
neutral light, we hold that the evidence is factually sufficient to show that
Appellant caused the child=s injuries.  See Courson v.
State, 160 S.W.3d 125, 127-28 (Tex. App.CFort Worth 2005, no. pet.) (holding evidence legally and factually
sufficient to support appellant=s conviction for causing injury to a child with a deadly weapon when
the State presented evidence from doctors that the child suffered a traumatic
event in the twenty-four-hour period before appellant brought her to the
hospital and the evidence showed appellant was the child=s primary caregiver during that twenty-four-hour period); see also
Carlson v. State, No. 01-04-00880-CR, 2005 WL 3315252, at *4-5 (Tex. App.CHouston [1st Dist.] Dec. 8, 2005, no pet.) (not designated for
publication) (holding evidence factually sufficient to show appellant caused
child=s injuries when physicians testified that the symptoms of the child=s type of injury would typically occur within a short period of time
after the injury was inflicted, appellant was twice found alone with the child
during the twenty-four-hour period before the child was taken to the hospital,
the State presented evidence showing appellant had previously handled the child
roughly, and the State presented evidence that appellant reacted unusually to
his son=s diagnosis).  We
overrule Appellant=s sole
point.

VI.    Conclusion

Having
overruled Appellant=s point, we
affirm the trial court=s judgment.

PER CURIAM

 

PANEL F:    GARDNER, LIVINGSTON, and DAUPHINOT, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: March 2, 2006











[1]See Tex. R. App. P. 47.4.





[2]Dr.
Mitchell testified that Aacute@
means fresh blood, Asubacute@
means blood that may have been there for two to five weeks and is in the
process of being absorbed and reutilized by the body, and Achronic@
means blood that has been there for a few weeks or one to two months.  





[3]At
the time of trial, the child was almost two years old.  Dr. McGlothlin testified that although he had
recovered significantly, he has epilepsy and cerebral palsy, resulting directly
from the injury.  Dr. McGlothlin also
stated that, at the time of trial, the child was delayed in his development,
had difficulty moving the left side of his body, and continued to have
occasional seizures. 





[4]Dr.
Natarajan explained:  AFor
my purposes when we=re
looking at acute, we=re
saying probably less than seven days; subacute depending on which text you use
can be one to two weeks to three weeks; and then chronic can be more than two
to three weeks in age.@