BOWDEN V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-402-CR

HERBERT RONALD BOWDEN APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY

------------

OPINION

------------

Appellant Herbert Ronald Bowden was convicted by a jury of reckless injury to a child.  The trial court sentenced him to ten years’ confinement in accordance with the jury’s assessment.  In two issues on appeal, appellant contends that the evidence is legally and factually insufficient to support his conviction.  Because we hold that the evidence is both legally and factually sufficient to support the jury’s verdict, we affirm.

Factual Background
(footnote: 1)
 This case involves a house fire in which two sisters, seven and eight years old, died.  Appellant is the boyfriend of the girls’ mother, Sharan Williams;
(footnote: 2) the girls were spending the night in a vacant house where appellant was temporarily living until he could get an apartment.  On the night of October 4, 2002, Sharan left the girls with appellant while she went out.  

The house where appellant and the girls were staying had no utilities or running water, so the girls were put to bed in a back bedroom with a candle in a pie plate on the floor between their bed and the wall.  In the early morning hours of October 5, a fire started in the back bedroom while appellant claims he was asleep on the couch.  The girls did not come out by themselves, and appellant tried to get them out of the room but could not.  The State charged both appellant and Sharan with two counts of reckless injury to a child. 

Legal and Factual Sufficiency Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Ross v. State
, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  The standard of review is the same for direct and circumstantial evidence cases.  
Burden v. State
, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); 
Kutzner v. State
, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
.   In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for that of the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case.  
Malik v. State
, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); 
Ortiz v. State
, 993 S.W.2d 892, 895 (Tex. App.—Fort Worth 1999, no pet.).  Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State’s theories of liability, and adequately describes the particular offense for which the defendant was tried.  
Gollihar v. State
, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); 
Malik, 
953 S.W.2d at 240.  The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument.  
See Curry
, 30 S.W.3d at 404.   

Elements of Offense

Injury to a child is a result-oriented offense; thus, it is not enough for the State to prove that the defendant engaged in the conduct with the requisite criminal intent.  
Lee v. State
, 21 S.W.3d 532, 540 (Tex. App.—Tyler 2000, pet. filed).  Instead, the State must also prove that the defendant caused the result with the requisite criminal intent.  
Id
.  A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.  
Tex. Penal Code Ann.
 § 6.04(a) (Vernon 2003).

A person acts recklessly when he is aware of, but consciously disregards, a substantial and unjustifiable risk that the result will occur. 
 Id
. § 6.03(c).  The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor’s standpoint. 
 Id
.  Reckless conduct involves conscious risk creation; that is, the actor was aware of the risk surrounding his conduct or the result of his conduct, but consciously disregarded that risk.  
See Lewis v. State
, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975).  The culpable mental state is generally proven through circumstantial evidence.  
See Dillon v. State
, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978).  

Indictment

In two counts, the indictment charged appellant with recklessly causing serious bodily injury to both girls “by leaving [them] in a room without adult supervision with a candle burning.”  As part of our legal sufficiency review, we must review the evidence as authorized by the most recent valid indictment in the record.  
See Curry
, 30 S.W.3d at 404.  In this case, the original indictment did not allege how appellant recklessly caused serious bodily injury to the children.  
See
 
Tex. Code Crim. Proc. Ann.
 art. 21.15 (Vernon 1989) (providing that whenever defendant is charged with recklessness in commission of offense, indictment must allege with reasonable certainty acts relied upon to constitute recklessness).  The State filed a motion to amend the indictment, which in paragraph 2 quoted the charging language from the indictment with the addition of “by leaving [them] in a room without adult supervision with a candle burning” to the reckless injury to a child count.  The trial court’s order granting the motion did not set forth the amended language in full but stated that the indictment was amended “as requested by the State in paragraph number two (2) of its Original Motion to Amend the Indictment.”  
Cf. Aguilera v. State
, 75 S.W.3d 60, 64 (Tex. App.—San Antonio 2002, pet. ref’d) (concluding that trial court order, which reproduced language of indictment with amending language included, effectively amended indictment); 
Valenti v. State
, 49 S.W.3d 594, 598 (Tex. App.—Fort Worth 2001, no pet.) (holding that physical interlineation on trial court order granting State’s motion to amend that reproduced original language of indictment was effective as amendment).  The indictment was never physically interlineated or reproduced.  
See Riney v. State
, 28 S.W.3d 561, 566 (Tex. Crim. App. 2000) (noting “that 
Ward v. State
 continues to stand for the proposition that ‘[n]either the motion [to amend] itself nor the trial judge’s granting thereof is an amendment; rather the two comprise the authorization for the eventual amendment of the charging instrument pursuant to Article 28.10'” and quoting 
Ward v. State
, 829 S.W.2d 787, 793 (Tex. Crim. App. 1992)).  But appellant did not file a motion to quash the indictment, nor did he object when the indictment was read with the amending language included.  In addition, appellant does not complain on appeal that the indictment was never amended or about any other defect in the indictment.  
See Robinson v. State
, No. 2-02-462-CR, 2003 WL 22253856, at *1 n.2 (Tex. App.—Fort Worth Oct. 2, 2003, pet. ref’d) (mem. op.) (not designated for publication).  In any event, we do not need to determine whether the indictment in this case was validly amended or not because our analysis is the same under either version of the indictment.
(footnote: 3)
Review of Evidence

Appellant contends that the fire was merely accidental and that his act of falling asleep on the couch while the candle was burning in the room where the girls were sleeping was not reckless because it did not constitute a gross deviation from the standard of care.
(footnote: 4)  The State responds that there is evidence in the record that appellant was aware of the danger that fire might result from burning candles in the house and that the room where the girls slept was unsafe because it had trash on the floor and inadequate escape options.  The State further suggests that there is evidence in the record from which the jury could reasonably infer that appellant was not in the house when the fire started and was unavailable to assist the girls until it was too late.

Zula Mae Scott, the girls’ grandmother, testified that the girls had lived with her since they were babies.  Sharan sometimes stayed at Zula Mae’s house with them but not all the time; she was mostly “in and out.”  Sharan had a key to Zula Mae’s house. 

When Zula Mae found out that appellant and Sharan had been taking the girls to spend the night at a vacant house, she told them it was too dangerous to be taking them there and lighting candles.  She also said she talked to them about the house catching on fire.  According to Zula Mae, Sharan said she always made sure to put the candles out before she went to sleep, and Zula Mae believed that if Sharan had been in the house that night, she would have done so. 

On the evening of October 4, Sharan was supposed to stay with the girls at Zula Mae’s house until Zula Mae came home from work.  Neither the girls nor Sharan were home when Zula Mae came home at 5:30.  She later learned that there had been a fire and the girls were dead. 

Lee Samuel Beatty lives on Dallas Street, a couple of houses down from the abandoned house, and was renovating the home next door.  In a statement to police after the fire, Beatty said that the girls should never have been in the house, but at trial, Beatty equivocated, saying that “the house was fine to me as far as them being in that house.  But, you know, some people may say maybe they shouldn’t have been there because the house was -- you know, didn’t have everything like water and stuff.”  Beatty testified that on the night of the fire he heard “some noise like screaming, or yelling, or something,” then he heard glass breaking.  He went outside because he thought someone was trying to break into a house and eventually saw appellant, who was upset.  

Beatty’s girlfriend, Brenda Strawn, testified next.  On the night of the fire, she heard screaming and glass breaking.  By the time she got outside, Beatty had already been outside for about ten minutes.  Strawn did not see Beatty at first, but she did see appellant, who was “like in shock or something” and not talking.  He just shook his head when she asked him what was happening.  She then saw Beatty trying to put out the fire.  In a prior statement to police, Strawn had stated that she asked appellant if the girls were in the house, but he kept saying he did not know. 

Officer Jonathan Lindsay testified that he was the first emergency responder to the fire.  When he arrived, the whole structure was in flames.  He saw appellant in front of the house; appellant had a towel wrapped around one of his hands and said to Officer Lindsay, “[M]y babies are inside, my babies are inside.”  Appellant was frantic, nervous, and scared.  Officer Lindsay did not see any burns on appellant, nor did he remember appellant coughing. 

Joanna Burgan, a paramedic, testified that she went to check on someone she was told was appellant.  Appellant was in a police car.  She saw blood on his hand but did not treat him because he told her he was okay.  Burgan did not notice any burns on appellant, nor did she hear him coughing.  She did not listen to his lungs, however.  According to Burgan, whether a person is suffering from smoke inhalation is usually determined by difficulty in breathing, mild coughing, and leaning forward while trying to take breaths.  In her opinion, there was no need to treat appellant for smoke inhalation; however, she acknowledged she was not evaluating appellant’s respiratory system at the time.  In response to cross-examination, Burgan admitted that some smoke inhalation damage can show up later and that some first degree burns do not appear until after a person is away from the heat source.  Appellant’s counsel also elicited testimony that appellant has dark skin, it was dark outside, and the only light available was the overhead light in the police car. 

Sergeant Ginger Harrill interviewed appellant twice after the fire.  The State admitted videotapes of the interviews, and a transcription of the interviews is included in the record.  

During appellant’s first interview, which took place about 4:00 a.m. the morning of the fire, appellant told Sergeant Harrill that he, Sharan, and the girls walked to the abandoned house from Zula Mae’s.  The girls stayed at the house that night because Sharan wanted to go out.  He said that he put the girls to bed in the back bedroom
(footnote: 5) about 7:30 or 8:00 p.m., lit a candle when it got dark, and then went to the couch in the front room
(footnote: 6) and fell asleep about 10:00.  When appellant got up to check on the girls, the back room was on fire; flames were coming out the door between the front rooms and the back room, and he could not get in the back room.  He went out the front door of the house, then around to the back where he knocked out the back bedroom window.  A dresser was in front of the window, and he knocked it over.  He also tried to get through a back exterior door to the bedroom, which had been nailed shut.  That door was also obstructed by a chair.  Appellant knocked the door down but could not get in. 

Appellant told Sergeant Harrill that before the fire that night he had gone a few houses down to Preston McFadden’s house for a cigarette, but he returned at 9:30 and checked on the girls, who were okay.  He was gone only about a minute, and the candle was lit while he was gone.  Sergeant Harrill told appellant that there were “neighbors that are saying you came walking down the alley was on fire [sic]” and that she needed appellant to tell the truth about whether he was gone when the house caught fire.  Appellant answered “No.”   In his second interview, which took place two days after the fire, appellant told Sergeant Harrill that McFadden woke him up “hollerin’” sometime after 11:00 p.m.  Appellant went out to talk to McFadden and was gone for about thirty seconds.  After appellant went back inside, he checked on the girls and then fell asleep on the couch.  He was not away from the house when the fire started.  Appellant said he would not have left the girls alone because “[k]ids can’t . . . take care of” themselves.  Appellant told Sergeant Harrill that he was awakened by the girls screaming.  According to appellant, the girls had stopped screaming by the time he knocked out the window. 

Appellant told Sergeant Harrill that the room the girls were in had two interior doors to it; one was closed and the other one was open.  The closed door
(footnote: 7) opened to the inside of the girls’ room and had no doorknob; thus, the girls could not have easily opened it from their room, and appellant would have had to push on it from outside the bedroom to open it.  Appellant said that the bedroom the girls were in had “just a little trash on the floor.” 

At first, appellant said that he was the one who lit the candle, but then said he remembered Sharan lit the candle while he and Sharan were in the bedroom talking before Sharan went out that night.  He said the candle was away from the bed and closer to the wall. 

Sergeant Harrill then testified that when she first interviewed appellant, he did not have on any shoes, which was consistent with his claim that he had been asleep when the fire started.  Based on appellant’s drawing that he made for Sergeant Harrill during the interview, the couch where he claimed to be sleeping was only about sixteen feet away from the candle. 

Officer Ronald Bukowski testified after Sergeant Harrill.  He confirmed that when he responded to the fire, appellant was upset and had a laceration on his hand.  He didn’t remember if appellant had been coughing or whether he had any burns. 

Battalion Chief Lynn Holzer of the Wichita Falls Fire Department testified that the fire was accidental.  By the time he arrived at the house, the fire was so strong that a person trying to go into the house would not “have lasted two or three seconds.”  In response to cross-examination, he said that if a window had been broken in the early stages of the fire, it would have added more oxygen to the fire and could possibly have created a variation in air pressure that would have caused an open door to the bedroom to shut.  He also confirmed that if a person is capable of screaming, the fire has probably not grown to the point where breathing the smoke and fire has damaged that person’s lungs.  He stated further that if someone had attempted to open a door to the bedroom while it was on fire, that person would probably suffer some smoke inhalation damage and maybe have burned their hands.  Battalion Chief Holzer also testified that the majority of home fires the department responds to are in homes with utilities and that a major concern for them is to make sure the utilities are turned off. 

The final witness at guilt-innocence was Jim Graham, the Assistant Fire Marshal for the Wichita Falls Fire Department.  Graham described how he investigated the fire and came to his conclusions about the cause and origin of the fire.  He concluded that the fire was started in the back bedroom by the accidental introduction of an open flame; based on appellant’s comments to him about the fire, he believed the fire was most likely started when clothing or a sheet came into contact with the candle, perhaps when one of the girls rolled over on the bed. 

Graham testified that based on the burn patterns on the wood, the front door of the house had been open during most of the fire, but the door between the front rooms and the back room where the girls were—the door that appellant claimed had been open—had been closed during most of the fire.  He said he could not tell if someone had opened and shut the door briefly.  He did state that if someone had tried to open the door when it was in flames, it probably would have collapsed.  When he found the door, it had fallen off its hinges and part of it was broken, but the majority of it was still intact.  When questioned about the lack of burns on appellant and the fact that appellant did not appear to have any smoke inhalation symptoms, Graham opined that that was not consistent with someone trying to open the door.  Graham confirmed that the second door, the one without the doorknob, was closed during the fire.   Graham opined that one of two scenarios was possible:  either the fire was “fully involved” as appellant described it and appellant did not open the door to the bedroom, or appellant opened the door before conditions were as bad as appellant said and left the girls inside.  Graham said he did not think anyone believed the second scenario.  Graham also said that if appellant broke the back window when the fire was fully engaged, a backdraft explosion would have occurred, burning appellant.  Graham could see no reason why the girls should not have been able to get out of the room unless the door between the back bedroom and the front rooms had been obstructed or locked.  But Graham also stated that there was no way to tell if the door had been locked or obstructed.  Graham thought the evidence was inconsistent with appellant opening the door to the bedroom.  But Graham admitted there were no facts from the physical evidence showing that appellant was not in the house when the fire started and that appellant could have been inside.  Graham did not think it possible that appellant’s breaking out the window could have caused the bedroom door to close.  Graham also testified that it’s unlikely the girls would have been able to break and escape through the window by themselves and that they would “more than likely” have needed some assistance or direction to get out of the room.  In addition, one of the girls “had enough carbon monoxide in her to have affected her ability to be able to escape or make any kind of decisions.” 

On cross-examination, Graham admitted that the majority of open-flame fires occur in homes with utilities and that a similar, albeit nonfatal, fire had occurred in Wichita Falls in a house that had electricity. 

Analysis

The evidence shows that appellant could have taken the girls back to Zula Mae’s house, a short walk away.  He could have stayed in the room with the girls.  Or he could have extinguished the candle if he did not want to stay in the room with them.  Instead, knowing that using candles in the house could potentially start a fire, appellant chose to allow the girls to sleep alone in a room with a candle in a pie tin on the floor close to the bed in a house that he knew had no running water or other means of extinguishing a fire and in a room with a blocked window and only one working door, which the jury was free to believe was shut during the duration of the fire.
(footnote: 8)  Even if appellant was asleep on the couch approximately sixteen feet away from the bedroom as he claims,
(footnote: 9) the evidence shows that he was not able to assist the girls in escaping the fire and they died as a result.
(footnote: 10)  According to the assistant fire marshal’s testimony, the girls more than likely would have needed assistance to escape the room.  Yet, appellant, knowing the risk that a fire could occur, left them unsupervised in the room with a burning candle.  Thus, we conclude that this evidence is both legally and factually sufficient to show that appellant’s conduct in leaving the girls alone in the room with a burning candle constituted a “gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from [appellant’s] standpoint.”  
Tex. Penal Code Ann.
 § 6.03(c).
(footnote: 11)
 In addition, there is evidence from which the jury could have believed appellant was not in the house when the fire started.  In her statement to police, Strawn stated that when she first encountered appellant outside the house (after hearing breaking glass), she asked him if the girls were in the house, and he said he did not know.  In addition, there was testimony that had appellant attempted to enter the bedroom when he said he did, he most likely would have suffered burns or smoke inhalation, but no one at the scene detected any burns or symptoms of smoke inhalation on appellant.  Appellant claimed that he was on the couch until he first noticed the fire, at which point he already saw flames coming out of the door to the bedroom.  Yet assistant fire marshal Graham testified that appellant could not have been on the couch for any length of time as the fire burned.  Finally, appellant’s statements were inconsistent about the times he left the house.  In his first statement, he said he left only once.  But in his second statement, he said he left twice, but the second time was only for about thirty seconds.  In those thirty seconds, he claims to have had a conversation with Preston McFadden.  Although we do not believe that these inconsistencies alone would support sufficient evidence to warrant a conclusion that appellant was not in the house when the fire started, the jury was entitled to consider these inconsistencies as proof of guilt in conjunction with Strawn’s testimony and the lack of burns on, or smoke inhalation symptoms of, appellant.  
See Guevara v. State
, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (stating that inconsistent statements are probative of wrongful conduct and circumstances of guilt and acknowledging that “[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction”); 
see also Tippitt v. State
, 41 S.W.3d 316, 326 (Tex. App.—Fort Worth 2001, no pet.) (acknowledging that inconsistencies in the appellant’s statements to police were “factors that could have been considered by the jury in determining his guilt”).  All of this evidence taken together supports a conclusion that appellant was not in the house when the fire started. This evidence is relevant as further evidence (in addition to the evidence detailed above) of the degree of appellant’s disregard of the appreciable risk of leaving the girls alone in the bedroom with the candle burning.  We do not suggest that the record contains evidence showing that “but for” appellant’s being outside of the house, he would have been able to save the girls from the burning room, thus preventing their deaths.  To the contrary, the evidence shows that once the fire started, it spread rapidly and reached flashpoint within a five to seven minute period.  There is no evidence that appellant would have been able to save the girls even if he had been on the couch when the fire started.  Thus, our conclusion is that there is sufficient evidence to show that appellant’s act of leaving the girls unsupervised in the room with the candle burning caused the girls’ deaths, not that appellant’s being out of the house when the fire started caused the girls’ deaths.  But that evidence is circumstantial evidence relevant to appellant’s mental state (i.e., disregard of the risk) and as such is appropriate to discuss in our sufficiency review.

We further conclude that the evidence of appellant’s awareness of the risk is factually sufficient.  Zula Mae testified that she warned both appellant and Sharan that lighting candles in the house could cause a fire.  This warning was in the context of her telling appellant and Sharan not to take the girls to the house where appellant was staying.  The jury was free to believe Zula Mae’s testimony.

This is a tragic case.  While we may not necessarily have reached the same conclusion as the fact finder, we may not second-guess the jury. Accordingly, we hold, based on our review of the record and the appropriate standards of review, and giving appropriate deference to the jury as fact finder, that the evidence is both legally and factually sufficient to support appellant’s conviction for reckless injury to a child.  

Conclusion

Having determined that the evidence is both legally and factually sufficient to support the jury’s verdict, we overrule appellant’s issues and affirm the trial court’s judgment.

TERRIE LIVINGSTON

JUSTICE

PANEL F: LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

PUBLISH

DELIVERED:  May 26, 2005

FOOTNOTES
1:
Because we must review the entire record to determine appellant’s issues, a more thorough recitation of the evidence introduced at trial follows the standard of review below.

2:
Sharan’s appeal is also before this court in cause number 02-03-472-CR.

3:
We note that the amendment, if valid, would restrict the State’s theory of the case to proving that appellant recklessly caused serious bodily injury to the children by leaving them in the room unsupervised with a lit candle.  We analyze the sufficiency of the evidence under this theory; however, we note that no other manner and means is raised by the evidence.

4:
In his legal sufficiency issue, appellant does not challenge the sufficiency of the evidence to support the other elements of the offense:  that appellant had responsibility for the children when they died, that the children suffered serious bodily injury, and that there is evidence of his awareness of the risk to the children.  But in his factual sufficiency issue, he does appear to argue that the evidence of his awareness of the risk is weak. 

5:
A copy of a drawing of the house that appellant made during the interview is attached to this opinion.  The drawing is oriented so that the southernmost parts of the house are closer to the top of the page and the northernmost parts are closer to the bottom.  The back bedroom where the girls were sleeping is shown in the bottom right corner of the drawing.

6:
The room shown in the upper left corner of the drawing, situated diagonally from the room the girls were sleeping in. 

7:
Shown in the drawing on the left side of the back bedroom. 

8:
Evidence of the proximity of the candle to the bed and the lack of an adequate escape route is relevant to the issue of causation—there is evidence that these things contributed to the fire that caused the girls’ deaths.  But there is no evidence that these were the sole cause of the girls’ deaths or that appellant’s act of leaving the girls unsupervised with the candle in the room would have been insufficient to cause the girls’ deaths.  
See
 
Tex. Penal Code Ann.
 § 6.04(a).   

9:
The thrust of appellant’s complaint on appeal is that his act of falling asleep was not a gross deviation from the standard of care.  But the State did not contend that appellant’s falling asleep caused the deaths, rather that appellant recklessly caused the girls’ deaths by leaving them without adult supervision in the room with the candle burning.

10:
Assistant fire marshal Graham testified that he did not think it would have made any difference which door or window appellant tried first in determining whether he could have rescued the girls from the fire. 

11:
Appellant does not appear to challenge the conclusion that his actions, whether leaving the room or falling asleep on the couch, were not a cause of the girls’ deaths.  
See
 
id
.
 § 6.04(a).