

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NOS.  2-07-118-CR
2-07-119-CR


JUAN MANUEL RAMOS                                    APPELLANT

V.

THE STATE OF TEXAS                                        STATE

------------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Juan Manuel Ramos appeals his convictions for possession of a controlled substance and possession of a firearm by a felon.  In four issues, Ramos challenges the legal and factual sufficiency of the evidence to support both of his convictions.  We will affirm.

---

[1]*See* TEX. R. APP. P. 47.4.

## II. FACTUAL BACKGROUND

Detective Moi Tran, a narcotics detective with the Carrollton Police Department, received intelligence from a school resource officer. The school resource officer said that someone he knew had gone to a house located at 1826 Kensington Drive in Carrollton and had observed an illegal tattoo parlor operating in the garage, that a peephole existed from the garage to the outside, and that drugs were present in the garage. Detective Tran also received intelligence regarding weapons at the location.

Following up on this information, Detective Tran and other officers conducted surveillance of the house. The officers noted that most of the activity at the house occurred late at night. One night, Detective Tran drove by the house, obtained the license plate numbers of the vehicles parked at the house, and ran them to see whom the vehicles were registered to. Detective Tran also researched real estate records to determine who owned the house. She also performed "trash runs" to ascertain whose name was on the mail received at the house.[2]

---

[2]Detective Tran testified that once people put trash beside the curb, it is considered abandoned property. A "trash run" occurs when an officer confiscates trash placed for pick up in front of a particular house and examines the contents of the trash.

As a result of three trash runs that Detective Tran performed at the house, she found illegal substances and evidence of narcotics use.[3] Based on the evidence discovered in her trash runs, Detective Tran obtained a search warrant for the house.

On August 3, 2006, Detective Tran went to execute the no-knock warrant at the house. She was accompanied by the SWAT team, an operational support unit working patrol, and a K-9 unit. As the group approached the house, officers observed a car leaving the house and stopped it. The driver of the car was Ramos's wife, Latonya; her younger brother or a relative was with her in the car. Latonya told the officers that she lived with Ramos at the house.

The SWAT team entered the house through the front door, using a breaching ram and throwing multiple flash-bang grenades into the house. Officers found Ramos and two children in the house.

---

[3]During Detective Tran's trash run on July 17, 2006, she found a green leafy substance that tested positive for marijuana, some drawings of tattoos, and a clear plastic baggie with a blue plastic straw in it. During Detective Tran's trash run on July 24, 2006, she found green leafy stems and seeds that tested positive for marijuana, a burnt joint, a cigarette, and some pictures. During Detective Tran's trash run on July 31, 2006, she found personal papers and mail in the name of Latonya Montoya and Christine Laparo (though no testimony at trial explained the latter individual's connection to the house) and a plastic baggie that contained a white powdery residue that tested positive for cocaine.

When Detective Tran came into the house, she saw that the officers had Ramos seated in the living room. Because she was assigned as the primary narcotics agent, she was responsible for doing a walk-through of the residence to determine the layout of the house, to determine whether there were any weapons that were exposed or that had been missed by the SWAT team, to determine whether there were any substances in plain view, and to determine where everyone was situated so that she could assign an agent to search each room.

During the search of the house, a K-9 unit alerted on the water heater closet in the garage near Ramos's tattoo workstation, and inside the closet officers found a dusty baggie of cocaine. In that same water heater closet, officers also found a red straw, which signified to Detective Tran that "they're snorting cocaine." Testing revealed that the net weight of the contents in the baggie was 0.01 grams and that the substance contained in the baggie was cocaine. However, no viable fingerprints were obtained from the baggie.

Detective Tran and Officer Sanchez, the K-9 handler, had begun searching the master bedroom closet for narcotics when Detective Tran was called outside. When Detective Tran returned, Officer Sanchez notified her that he had located an SKS assault rifle in the master bedroom closet, which was

4

shared by Ramos and his wife. No viable fingerprints were obtained from the rifle.

The only fingerprints that the State entered into evidence were those contained in Ramos's pen packet and those taken by Investigator Jack Grassman on the day of the trial. Grassman compared the two sets of fingerprints and found that they matched, concluding that Ramos was the same person who had been convicted of the felony offense in the pen packet—unlawful possession of a controlled substance, to-wit, cocaine in June 2001.

At the conclusion of the evidence, the jury found Ramos guilty of the offense of possession of a controlled substance and guilty of the offense of possession of a firearm by a felon. The jury assessed punishment at 180 days' confinement for the offense of possession of a controlled substance and at five years' confinement for the offense of possession of a firearm by a felon. The trial court sentenced Ramos in accordance with the jury's recommendations. This appeal followed.

### III. SUFFICIENCY STANDARDS OF REVIEW

#### A. Legal Sufficiency

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the prosecution in order

5

to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). We must presume that the fact-finder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

6

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Bowden v. State*, 166 S.W.3d 466, 470 (Tex. App.—Fort Worth 2005, pet. ref'd). Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); *Malik,* 953 S.W.2d at 240. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

The standard of review is the same for direct and circumstantial evidence cases. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

### B. Factual Sufficiency

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and

7

manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.3d at 414-15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the fact-finder's. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8.

8

Thus, we must give due deference to the fact-finder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9. An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

### IV. SUFFICIENCY OF EVIDENCE TO SUPPORT CONVICTION FOR POSSESSION OF CONTROLLED SUBSTANCE

In his first and second issues, Ramos argues that the evidence is legally and factually insufficient to support the jury's finding that he possessed the cocaine found in the water heater closet in the garage because the State failed to link it to him. Specifically, Ramos contends that the State failed to establish that he had exclusive control over the garage where the baggie of cocaine residue was found or that he knew that the package contained cocaine or even of its presence in the water heater closet.

The State charged Ramos with "possess[ion of] a controlled substance, to-wit: cocaine, in an amount of less than one (1) gram by aggregate weight including any adulterants or dilutants."[4] *See* TEX. HEALTH & SAFETY CODE ANN.

_____

[4]Possession is punishable as a third-degree felony if the amount of the controlled substance is less than one gram. TEX. HEALTH & SAFETY CODE ANN. § 481.115(b) (Vernon 2003).

§ 481.115(a) (Vernon 2003).  To prove possession of a controlled substance, the State had to prove that Ramos (1) exercised actual care, custody, control, or management over the contraband and (2) that he knew the matter possessed was contraband.  *See id.* §§ 481.002(38), 481.115(a); *Deshong v. State*, 625 S.W.2d 327, 329 (Tex. Crim. App. [Panel Op.] 1981); *Taylor v. State*, 106 S.W.3d 827, 830 (Tex. App.—Dallas 2003, no pet.).

The State does not have to prove that the accused had exclusive possession of the contraband; joint possession is sufficient to sustain a conviction.  *See Cude v. State*, 716 S.W.2d 46, 47 (Tex. Crim. App. 1986).  When there is no evidence that the appellant was in exclusive control of the place where the contraband was found, however, the State must offer additional, independent facts and circumstances that "link" the accused to the contraband.  *See Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005); *Deshong*, 625 S.W.2d at 329; *see also Evans v. State*, 202 S.W.3d 158, 161 n.9 (Tex. Crim. App. 2006) ("We have used that term 'affirmative links,' but we recognize that 'affirmative' adds nothing to the plain meaning of 'link.'  Henceforth, we will use only 'link' so that it is clear that evidence of drug possession is judged by the same standard as all other evidence.").  The links between Ramos and the contraband must be established by either direct or circumstantial evidence.  *See Poindexter*, 153 S.W.3d at 406.

No formula of facts exists to dictate a finding of links sufficient to support an inference of knowing possession. *See Taylor*, 106 S.W.3d at 830. It is the logical force of the evidence, and not the number of links, that supports a fact-finder's verdict. *See Evans*, 202 S.W.3d at 166. Possible links include but are not limited to the following: (1) whether the defendant was present when the drugs were found; (2) whether the drugs were in plain view; (3) the defendant's proximity to and the accessibility of the drugs; (4) whether the defendant was under the influence of drugs when arrested; (5) whether the defendant possessed other contraband or drugs when arrested; (6) whether the defendant made any incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of drugs; (10) whether other contraband or other drug paraphernalia was present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt. *Id.* at 162 n.12.

In this case, the dusty baggie of cocaine residue that the K-9 unit alerted to was found after Detective Tran had performed three consecutive trash runs at 1826 Kensington Drive that confirmed what intelligence had reported—that

an illegal tattoo parlor was being operated and that there were drugs present. Although the testimony at trial did not establish exactly where Ramos was found in the house when the search warrant was executed, it did establish that he was the only adult in the house when the drugs were found. Inside the same water heater closet, near the baggie with cocaine residue, officers located a plastic straw that they believed to be for use in snorting cocaine. A business card for the tattoo parlor advertised that Monolo Montoya, a/k/a Manny[5] operated the tattoo parlor located in the house's garage. Latonya told Detective Tran that the substances found belonged to Ramos. The enclosed water heater closet was close to and accessible from the work area Ramos occupied in the garage tattoo parlor.

Detective Tran testified, however, that she did not see anything on Ramos's tattoo work table in the garage that would indicate narcotics use and that she was told that there were no fingerprints on the baggie.

Although this evidence satisfies less than the full series of indicia listed above, viewing the evidence in a favorable or neutral light, the foregoing evidence is sufficient to enable a rational fact-finder to link Ramos—who had a prior conviction for possession of cocaine—to the cocaine found in the water

---

[5]The record reflects that Ramos used the alias Monolo Montoya, a/k/a Manny.

heater closet in his garage tattoo parlor. *See Poindexter*, 153 S.W.3d at 405, 411-12 (concluding that appellant exercised care, custody, control, and management over the contraband and that appellant knew the substance possessed was contraband because there was no evidence that would support a conclusion that appellant was an innocent bystander to someone else's drug operations within his own home where officers found cocaine hidden in ceiling of master bedroom's linen closet—a secret place that was accessible to appellant as a resident but not to a casual visitor). We hold that evidence is legally and factually sufficient to link Ramos to the cocaine residue. *See Poindexter*, 153 S.W.3d at 405, 412; *Berrum v. State*, No. 11-01-00011-CR, 2002 WL 32341848, at *2-3 (Tex. App.—Eastland Jan. 10, 2002, no pet.) (not designated for publication) (holding that evidence was legally and factually sufficient to link appellant to cocaine that was found in a closet underneath the stairs, which was conveniently accessible to appellant); *Thompson v. State*, No. 07-99-00403-CR, 2000 WL 987303, at *1-2 (Tex. App.—Amarillo July 18, 2000, no pet.) (not designated for publication) (holding that, although evidence satisfied less than the full series of indicia, evidence was legally sufficient to link appellant to cocaine found in a space heater in hall closet); *Matthews v. State*, No. 01-97-01348-CR, 1999 WL 233510, at *4-5 (Tex. App.—Houston [1st Dist.] Apr. 22, 1999, pet. ref'd) (not designated for

13

publication) (holding that evidence was legally and factually sufficient to support jury's finding that appellant was guilty of possession of cocaine that was found in bedroom closet that appellant shared with his wife). *Cf. Pierce v. State*, No. 03-06-00492-CR, 2007 WL 4269796, at *15-16 (Tex. App.—Austin Dec. 5, 2007, no pet.) (mem. op.) (not designated for publication) (holding that evidence was legally insufficient to connect appellant to methamphetamine lab at house because evidence revealed that appellant had moved and was no longer living at residence where lab was found). We overrule Ramos's first and second issues.

### V. SUFFICIENCY OF EVIDENCE TO SUPPORT CONVICTION FOR POSSESSION OF A FIREARM BY A FELON

In his third and fourth issues, Ramos argues that the evidence is legally and factually insufficient to support the jury's finding that he possessed the firearm that officers found in the master bedroom closet. Specifically, Ramos contends that there was no evidence that he exercised actual care, control, or custody of the firearm and that there is no evidence from which the jury could have determined that he was aware that the firearm was in his closet.

Texas Penal Code section 46.04 provides that a person who has been convicted of a felony commits an offense if he possesses a firearm after the conviction and before the fifth anniversary of the person's release from

14

confinement. TEX. PENAL CODE ANN. § 46.04 (Vernon Supp. 2007). Ramos does not challenge the evidence introduced by the State showing that he was previously convicted of the felony of unlawful possession of cocaine within the past five years. Instead, he argues only that he did not possess the firearm that officers found. Our analysis will therefore focus on this narrow argument.

Possession is defined by the penal code as "actual care, custody, control, or management." TEX. PENAL CODE ANN. § 1.07(a)(39) (Vernon Supp. 2007). When there is no evidence that the appellant was in exclusive control of the place where the firearm was found, the State must offer additional, independent facts and circumstances that link him to the firearm. *Smith v. State*, 176 S.W.3d 907, 916 (Tex. App.—Dallas 2005, pet. ref'd). The links between Ramos and the firearm may be established by either direct or circumstantial evidence. *See Poindexter*, 153 S.W.3d at 406. In determining whether sufficient links exist, we examine the same factors we looked to in connection with Ramos's first and second issues, such as whether the firearm was in plain view, whether Ramos owned the premises where the firearm was found, whether he was in close proximity to the firearm and had ready access to it or whether it was found on him, whether he attempted to flee, whether his conduct indicated a consciousness of guilt, whether he had a special connection to the firearm, whether the firearm was found in an enclosed space,

15

and whether he made incriminating statements. *Smith*, 176 S.W.3d at 916. It is the logical force of the factors, not the number of factors present, that determines whether the elements of the offense have been established. *Id.*

As mentioned above, while Ramos was detained in the living room, Detective Tran and Officer Sanchez had begun searching the master bedroom closet for narcotics when Detective Tran was called outside. Officer Sanchez thereafter located an SKS assault rifle with no bullets in it and pointed it out to Detective Tran when she came back inside the house. The evidence did not reveal the exact location within the master bedroom closet where the rifle was found, and no viable fingerprints were found on the rifle. Officers noted that the master bedroom closet contained mail addressed to Latonya as well as pictures of and mail addressed to Ramos and that there was female clothing on one side and male clothing on the other side of the closet.[6] Based on these findings, Detective Tran testified that she believed that Latonya and Ramos shared the closet. Pictures admitted into evidence showed that the closet was neat and tidy.

---

[6]Although it was never independently established that the men's clothing in the master bedroom closet where the rifle was found was Ramos's clothing, there was no suggestion that any other male lived at the house or shared a closet with Latonya, who had admitted that Ramos was her husband; thus, it was at least "a" reasonable inference that it was Ramos's clothing and that he lived there. *See Evans*, 202 S.W.3d at 165.

16

Viewed in the light most favorable to the verdict, a rational trier of fact could have found from the foregoing evidence that Ramos possessed the firearm that officers discovered in the master bedroom closet, which Ramos shared with his wife. The pictures of the well-organized master bedroom closet indicated that it would be difficult to conceal an SKS assault rifle from someone who presumably went into the closet every day to retrieve clothes and shoes. Viewing all the evidence in a neutral light, the evidence that Ramos shared the closet with his wife and that there were no viable fingerprints on the rifle slightly controverts the evidence of guilt but is not so weak that the fact-finder's determination is clearly wrong and unjust. We therefore hold that the evidence is legally and factually sufficient to prove that Ramos knew of, exercised control over, and therefore possessed the rifle. *See Smith v. State*, No. 12-06-00021-CR, 2007 WL 2178541, at *3 (Tex. App.—Tyler July 31, 2007, no pet.) (mem. op.) (not designated for publication) (holding that evidence was legally and factually sufficient to support conviction for unlawful possession of firearm when pistol was found in plain view in linen closet next to bedroom where appellant slept); *Austin v. State*, Nos. 14-00-01389-CR, 14-00-01390-CR, 2002 WL 370045, at *3 (Tex. App.—Houston [14th Dist.] Mar. 7, 2002, no pet.) (not designated for publication) (holding that evidence was legally and factually sufficient to support conviction for unlawful possession of

17

firearm that officers found in bedroom closet because closet contained mail addressed to appellant); *Holland v. State*, Nos. 05-99-00821-CR, 05-99-00822-CR, 2002 WL 115582, at *7 (Tex. App.—Dallas Jan. 30, 2002, pet. ref'd) (not designated for publication) (holding that evidence was legally sufficient to support conviction for unlawful possession of firearm that officers found in back center closet that was accessible to appellant).  We overrule Ramos's third and fourth issues.

## VI.  CONCLUSION

Having overruled all of Ramos's issues, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL A:   CAYCE, C.J.; HOLMAN and WALKER, JJ.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED: March 6, 2008