

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-436-CR

STEPHEN LANCE HEARD                                                      APPELLANT

V.

THE STATE OF TEXAS                                                            STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

------------

## OPINION

------------

### I. INTRODUCTION

A jury convicted Stephen Lance Heard of capital murder and assessed his punishment at life in prison. In a single point, Heard argues that the evidence is legally insufficient to support his conviction. We will affirm.

### II. FACTUAL AND PROCEDURAL BACKGROUND

Heard pulled up to a gas station in Sansom Park with two women, Sally Renae Smith (Renae) and Betty Diane Newell (Diane), in the truck. One of the

women went inside the store and asked the clerk, Wali Sher, if the store accepted checks. Sher said that it did not, and the woman returned to the truck. Heard, Renae, and Diane sat in the truck for fifteen or twenty minutes, which made Sher curious so he wrote down the truck's license plate number. Heard then drove off without removing the gas nozzle, causing it to snap off the tank. Sher ran outside, stopped the truck, and asked Heard to come inside and write a report. Heard accompanied Sher inside the store and showed Sher his driver's license, but he refused to remove the license from his wallet. He started backing away toward the door, and when Sher said that he would call 911, Heard ran out to his truck and sped away. Sher called the police.

Sansom Park police officer Matthew Roberts saw the truck and activated his lights. Heard then led officers on a high-speed chase. He drove into a field and fled on foot, leaving Renae and Diane in the truck. Officers arrested Renae and Diane and searched the field for Heard, but the officers stopped the search after the women said Heard was armed. At the time, a blue warrant[1] had been issued for Heard's arrest based on several parole violations. An inventory of the truck revealed numerous items used for identity theft and check fraud.

---

[1] A "blue warrant" is an arrest warrant issued when a parolee has been suspected of violating the conditions of his probation. *See Blaylock v. State*, 259 S.W.3d 202, 209 n.2 (Tex. App.—Texarkana 2008, pet. ref'd).

2

Based on what the officers found in the truck and learned from the women, they called Officer Henry Nava, an officer with the Fort Worth Police Department's Critical Response Team, to assist them. Officer Nava began working with the Sansom Park Police Department. Renae told Officer Nava that Heard was involved with identity theft for the Aryan Brotherhood and that Heard would kill a police officer. She also said that Heard might be at the trailer she shared with her husband Mike Newell, her mother, and Diane.

Officer Nava enlisted Fort Worth Critical Response Team officers Stephen Myers and Ernesto Tamayo to go to the trailer and look for Heard. The officers agreed that Officer Tamayo would approach the front door wearing a TXU hard hat and a work shirt over his police uniform while Officer Myers and Officer Nava would wait in their vehicles down the street until Officer Tamayo radioed for them to pull up to the trailer.[2]

Officer Tamayo drove up to the trailer in an unmarked pickup truck. Wearing his disguise, he knocked on the door. Once Mike Newell opened the door, Officer Tamayo identified himself as a police officer, showed Mike his

---

[2] Officer Myers testified that officers in his unit would often wear work shirts over their uniforms when serving blue warrants because people with outstanding warrants are less likely to answer the door to a police officer. Officer Myers also explained that a person standing within three to four feet of an officer wearing this type of disguise could tell that the person was a police officer.

badge, and asked if Renae was home. Mike called for Renae by saying, "Renae, the police are here. They want to see you." Mike spoke loudly enough for Renae to hear him down the hall. Officer Tamayo then radioed for the other two officers to drive up to the trailer. Officer Nava drove a red Grand Prix, and Officer Myers drove a marked police car. Officer Nava wore a grey hooded sweatshirt, jeans, and a duty belt holding his radio, taser, gun, magazine, and police badge. Officer Myers wore his tactical uniform, including a sweatshirt with the words "Police" written down each sleeve; his tactical ballistic vest with the word "Police" written across the right chest and the back and a police badge on the left chest; and his gun belt.

Renae came outside and said Heard was not there; she agreed to let the officers come in and look around inside for him. Renae opened the door and told Mike in a very loud voice that "the police want to come in and search." Officer Myers entered the trailer first and followed Renae to the left, towards the east bedroom. Officer Tamayo entered next and immediately took off the work shirt and TXU hard hat, leaving only his police sweatshirt and police tactical vest. Officer Nava entered the house last and pushed open the door to the middle bedroom, which was directly in front of him about an arm's length from the front door. Officer Tamayo was standing to the left of Officer Nava and could see inside the bedroom. He saw an arm holding a gun, aimed in the

4

officers' direction, protruding from a closet door inside the bedroom. Officer Nava yelled, "Gun," and Officer Tamayo saw the muzzle flash. Heard fired first; the officers then drew their guns and returned fire.

Officer Myers fired a total of nine shots into the middle bedroom wall, Officer Tamayo fired sixteen shots into the bedroom, and Officer Nava fired nine shots. Heard fired ten shots from inside the bedroom. During the gunfire, Heard shot Officer Nava in the head. Officer Myers yelled, "Officer down," but the gunfire from the bedroom continued. Officer Tamayo and Officer Myers continued returning fire until they heard glass break and the gunfire stop.

Heard had broken out a window in the bedroom and fled the trailer. He ran to a house a few streets over and held a woman hostage at gunpoint for two to three hours while police surrounded the house. Heard told the woman that he had shot someone and that he did not know that the person was a police officer. Heard told the first officers on the scene at the woman's trailer, "I ain't going back. Y'all are going to have to shoot me. If y'all come -- if ya'll come in here, ya'll are going to be fucking up. I've got a girl in here." Heard kept asking whether the "officer" would be okay. Heard eventually released the hostage and surrendered to police. Officer Nava died the next afternoon.

5

### III. LEGAL SUFFICIENCY

Heard contends that the evidence is legally insufficient to support his conviction for capital murder. He concedes that he is guilty of murder or felony murder but argues that the evidence was legally insufficient to establish that he knew that Officer Nava was a police officer in order to support his conviction for capital murder.

### A. Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal sufficiency review, we

may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Bowden v. State*, 166 S.W.3d 466, 470 (Tex. App.—Fort Worth 2005, pet. ref'd). Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); *Malik,* 953 S.W.2d at 240. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

7

**B. Legally Sufficient Evidence**

A person commits the offense of capital murder if he "murders a peace officer . . . who is acting in the lawful discharge of an official duty and who the person knows is a peace officer." Tex. Penal Code Ann. § 19.03(a)(1) (Vernon Supp. 2008). The question we must answer is whether, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that Heard knew that Officer Nava was a police officer when he shot him. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.

The jury heard testimony regarding the chain of events leading up to the shooting. Almost thirty days before the shooting, a blue warrant issued for Heard's arrest based on several parole violations. Heard's parole officer testified that she had advised Heard that a warrant could issue for his parole violations. Diane's mother testified that a few weeks before Heard shot Officer Nava, she overheard a fight between Heard and Diane in which Heard said that if the police started looking for him because of his parole violations, he would take out as many of them as he could. A few days before Heard killed Officer Nava, Heard fled a gas station and led police on a high-speed chase before driving into a field and taking off on foot. Corporal Curtis Boone, one of the officers who arrived at the field, testified that Renae told him then that Heard would kill a police officer. A Secret Service agent who talked to Diane and

8

Renae also testified that Diane said Heard was dangerous and "somebody would possibly die" in the end. Mike testified that on the day of the shooting, Diane and Renae told Heard that the officers had asked them questions about the computer equipment found in Heard's truck.

The jury heard extensive testimony regarding what Heard may have heard when the officers approached the trailer based on Heard's location and the build and layout of the trailer. Mike testified that after he answered the door to Officer Tamayo, he called for Renae, saying, "[T]he police are here. They want to see you." Mike further testified that Renae also said the police were there, which he found strange because he had just told her that. Officer Myers testified that he too found it strange because Mike was seated only about six feet away in the living room. During these exchanges, Heard was in the middle bedroom. Mike testified that the door to the middle bedroom is about an arm's reach back from the front doorway. He explained that the trailer was a small, older model trailer and that the inside walls were constructed with very thin paneling and did not have any insulation. He testified that someone paying attention could figure out anything going on in the trailer from any room. The State read in front of the jury the following portion of one of Mike's statements made after the shooting: "[Heard] maybe could have heard when the officer told me he was the police, but when Renae came in and said they were going to

9

search the place, she said it loud enough that [Heard] could have heard it in the bedroom; the doors in the trailer are hollow and thinner than pressed board." Diane's mother testified that if she were in her room (located on the far east side of the trailer), she could hear music being played in Diane's room (located on the far west side of the trailer). The jury saw a diagram of the layout of the trailer, multiple photographs of the inside of the trailer, and a piece of the trailer's interior wall.

The jury heard extensive testimony about what the police officers wore to identify themselves as police officers on the day of the shooting and whether Heard could have seen the officers from his position in the middle bedroom. Mike testified that when he answered the door, he could tell that Officer Tamayo was wearing a bulletproof police vest under the work shirt. A man who lived across the street also testified that he saw an unmarked car pull up to the trailer and an officer get out of the car. He testified, "And obviously, it was an officer. He had his gun in open display, and he had his vest on." When Officer Nava pushed open the door to the middle bedroom, Officer Tamayo was wearing his police sweatshirt and police tactical vest and Officer Nava was wearing his duty belt with his badge on it. The jury saw photographs of these items. Edward Hueske, a crime reconstruction expert for the State, explained that someone at the foot of the bed in the middle bedroom could see the

10

badges the officers wore while standing in the doorway to the bedroom—where Officer Nava stood when Heard shot him.

Both Officer Tamayo and Officer Myers testified that after Officer Nava was shot and after Officer Myers yelled, "Officer down," Heard continued firing shots from the middle bedroom. An officer who arrived at the trailer shortly after the shooting testified that Renae said that they saw the officers approaching the trailer and that Heard threatened to kill her if she let the officers inside the trailer, accused her of "snitching" on him by telling the police that he was in the trailer, and said he would be listening.

Despite the above evidence, Heard argues that because the State did not conduct sound testing in the trailer to determine whether Heard could have heard the police when they entered the trailer and because Heard's shot pattern was "chaotic," a rational juror could not have found beyond a reasonable doubt that Heard knew Officer Nava was a police officer when he shot him. The detectives and the prosecutor discussed whether to conduct acoustical testing in the trailer and decided against it because they would not be able to duplicate certain noise factors such as the volume of the TV, the voices, and the air conditioner. Defense expert Max Courtney testified that he conducted experiments—not scientific in nature—in the trailer to determine "what a reasonable person might be able to hear" from inside the middle bedroom with

11

the air conditioner blowing; he determined that people could not hear conversations outside of the bedroom with the air conditioner on high. On cross-examination, Courtney testified that he could be a little hard of hearing and agreed that it is possible that someone who knew the police were looking for him would have a heightened awareness of what was going on.

The evidence showed that Heard fired ten shots—some through the ceiling of the bedroom, some through the air conditioner, and some through the wall toward the officers. Courtney testified that two of Heard's shots were directed toward the doorway, and a State crime reconstruction expert opined that the distance from Heard to Officer Nava and the way the bullet hit Officer Nava indicated that "the shooter was intending to hit the target."

Contrary to Heard's assertions, a rational juror could have found, based on the evidence presented at trial, that Heard knew the police were looking for him, said he would kill a police officer, saw the police officers approaching the trailer, heard Mike and Renae say the police were there, saw that the men were police officers, and continued shooting after Officer Myers said an officer was down. Based on this evidence, a rational jury could have found beyond a reasonable doubt that Heard knew that Officer Nava was a peace officer when he shot him. *See* Tex. Penal Code Ann. § 19.03(a)(1); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Escamilla v. State*, 143 S.W.3d 814, 820–21 (Tex.

12

Crim. App. 2004).  After reviewing the evidence in the light most favorable to the verdict and giving full play to the responsibility of the jury to weigh the evidence and draw reasonable inferences from basic facts to ultimate facts, we hold that a rational trier of fact could have found beyond a reasonable doubt that Heard committed capital murder.  *See* Tex. Penal Code Ann. § 19.03(a)(1); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.  Because the evidence is legally sufficient to support the jury's verdict, we overrule Heard's sole point.

## IV. CONCLUSION

Having overruled Heard's sole point, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL: LIVINGSTON, DAUPHINOT, and WALKER, JJ.

PUBLISH

DELIVERED: January 8, 2009

13