COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-436-CR

 

 

STEPHEN LANCE HEARD                                                      APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM CRIMINAL
DISTRICT COURT NO. 3 OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I.
Introduction

A jury convicted Stephen Lance Heard of capital
murder and assessed his punishment at life in prison.  In a single point, Heard argues that the
evidence is legally insufficient to support his conviction.  We will affirm.

II. Factual
and Procedural Background








Heard pulled up to a gas station in Sansom Park
with two women, Sally Renae Smith (Renae) and Betty Diane Newell (Diane), in
the truck.  One of the women went inside
the store and asked the clerk, Wali Sher, if the store accepted checks.  Sher said that it did not, and the woman
returned to the truck.  Heard, Renae, and
Diane sat in the truck for fifteen or twenty minutes, which made Sher curious
so he wrote down the truck=s
license plate number.  Heard then drove
off without removing the gas nozzle, causing it to snap off the tank.  Sher ran outside, stopped the truck, and
asked Heard to come inside and write a report. 
Heard accompanied Sher inside the store and showed Sher his driver=s
license, but he refused to remove the license from his wallet.  He started backing away toward the door, and
when Sher said that he would call 911, Heard ran out to his truck and sped away.  Sher called the police. 

Sansom Park police officer Matthew Roberts saw
the truck and activated his lights. 
Heard then led officers on a high-speed chase.  He drove into a field and fled on foot,
leaving Renae and Diane in the truck. 
Officers arrested Renae and Diane and searched the field for Heard, but
the officers stopped the search after the women said Heard was armed.  At the time, a blue warrant[1]
had been issued for Heard=s arrest based on several parole
violations.  An inventory of the truck
revealed numerous items used for identity theft and check fraud.     








Based on what the officers found in the truck and
learned from the women, they called Officer Henry Nava, an officer with the
Fort Worth Police Department=s
Critical Response Team, to assist them. 
Officer Nava began working with the Sansom Park Police Department.  Renae told Officer Nava that Heard was
involved with identity theft for the Aryan Brotherhood and that Heard would
kill a police officer.  She also said
that Heard might be at the trailer she shared with her husband Mike Newell, her
mother, and Diane. 

Officer Nava enlisted Fort Worth Critical
Response Team officers Stephen Myers and Ernesto Tamayo to go to the trailer
and look for Heard.  The officers agreed
that Officer Tamayo would approach the front door wearing a TXU hard hat and a work
shirt over his police uniform while Officer Myers and Officer Nava would wait
in their vehicles down the street until Officer Tamayo radioed for them to pull
up to the trailer.[2]   








Officer Tamayo drove up to the trailer in an
unmarked pickup truck.  Wearing his
disguise, he knocked on the door.  Once
Mike Newell opened the door, Officer Tamayo identified himself as a police
officer, showed Mike his badge, and asked if Renae was home.  Mike called for Renae by saying, ARenae,
the police are here.  They want to see
you.@  Mike spoke loudly enough for Renae to hear
him down the hall.  Officer Tamayo then
radioed for the other two officers to drive up to the trailer.  Officer Nava drove a red Grand Prix, and
Officer Myers drove a marked police car. 
Officer Nava wore a grey hooded sweatshirt, jeans, and a duty belt
holding his radio, taser, gun, magazine, and police badge.  Officer Myers wore his tactical uniform,
including a sweatshirt with the words APolice@ written
down each sleeve; his tactical ballistic vest with the word APolice@ written
across the right chest and the back and a police badge on the left chest; and
his gun belt.   








Renae came outside and said Heard was not there;
she agreed to let the officers come in and look around inside for him.  Renae opened the door and told Mike in a very
loud voice that Athe police want to come in and
search.@  Officer Myers entered the trailer first and
followed Renae to the left, towards the east bedroom.  Officer Tamayo entered next and immediately
took off the work shirt and TXU hard hat, leaving only his police sweatshirt
and police tactical vest.  Officer Nava
entered the house last and pushed open the door to the middle bedroom, which
was directly in front of him about an arm=s length
from the front door.  Officer Tamayo was
standing to the left of Officer Nava and could see inside the bedroom.  He saw an arm holding a gun, aimed in the
officers=
direction, protruding from a closet door inside the bedroom.  Officer Nava yelled, AGun,@ and
Officer Tamayo saw the muzzle flash. 
Heard fired first; the officers then drew their guns and returned
fire.   

Officer Myers fired a total of nine shots into the
middle bedroom wall, Officer Tamayo fired sixteen shots into the bedroom, and
Officer Nava fired nine shots.  Heard
fired ten shots from inside the bedroom. 
During the gunfire, Heard shot Officer Nava in the head.  Officer Myers yelled, AOfficer
down,@ but the
gunfire from the bedroom continued. 
Officer Tamayo and Officer Myers continued returning fire until they
heard glass break and the gunfire stop.  


Heard had broken out a window in the bedroom and
fled the trailer.  He ran to a house a
few streets over and held a woman hostage at gunpoint for two to three hours
while police surrounded the house.  Heard
told the woman that he had shot someone and that he did not know that the
person was a police officer.  Heard told
the first officers on the scene at the woman=s
trailer, AI ain=t going
back.  Y=all are
going to have to shoot me.  If y=all come
-- if ya=ll come
in here, ya=ll are going to be fucking
up.  I=ve got a
girl in here.@ 
Heard kept asking whether the Aofficer@ would
be okay.  Heard eventually released the
hostage and surrendered to police. 
Officer Nava died the next afternoon. 

 

 








III. Legal
Sufficiency

Heard contends that the evidence is legally
insufficient to support his conviction for capital murder.  He concedes that he is guilty of murder or
felony murder but argues that the evidence was legally insufficient to
establish that he knew that Officer Nava was a police officer in order to
support his conviction for capital murder. 


A. 
Standard of Review

In reviewing the legal sufficiency of the
evidence to support a conviction, we view all the evidence in the light most
favorable to the prosecution in order to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007).








This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  The trier of fact is the sole judge of the
weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v. State,
34 S.W.3d 912, 919 (Tex. Crim. App. 2000). 
Thus, when performing a legal sufficiency review, we may not re-evaluate
the weight and credibility of the evidence and substitute our judgment for that
of the factfinder.  Dewberry v. State,
4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131
(2000).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@ 
Hooper v. State, 214 S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the factfinder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.

The sufficiency of the evidence should be
measured by the elements of the offense as defined by the hypothetically
correct jury charge for the case.  Malik
v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); Bowden v. State,
166 S.W.3d 466, 470 (Tex. App.CFort
Worth 2005, pet. ref=d).  Such a charge would be one that accurately
sets out the law, is authorized by the indictment, does not unnecessarily
restrict the State=s theories of liability, and
adequately describes the particular offense for which the defendant was
tried.  Gollihar v. State, 46
S.W.3d 243, 253 (Tex. Crim. App. 2001); Malik, 953 S.W.2d at 240.  The law as authorized by the indictment means
the statutory elements of the charged offense as modified by the charging
instrument.  See Curry v. State,
30 S.W.3d 394, 404 (Tex. Crim. App. 2000).      








B.  Legally
Sufficient Evidence








A person commits the offense of capital murder if
he Amurders
a peace officer . . . who is acting in the lawful discharge of an official duty
and who the person knows is a peace officer.@  Tex. Penal Code Ann. ' 19.03(a)(1)
(Vernon Supp. 2008).  The question we
must answer is whether, viewing the evidence in the light most favorable to the
State, a rational trier of fact could have found that Heard knew that Officer
Nava was a police officer when he shot him. 
See Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235
S.W.3d at 778.         The jury heard testimony regarding the chain of events leading
up to the shooting.  Almost thirty days
before the shooting, a blue warrant issued for Heard=s arrest
based on several parole violations. 
Heard=s parole officer testified that
she had advised Heard that a warrant could issue for his parole
violations.  Diane=s mother
testified that a few weeks before Heard shot Officer Nava, she overheard a
fight between Heard and Diane in which Heard said that if the police started
looking for him because of his parole violations, he would take out as many of
them as he could.  A few days before
Heard killed Officer Nava, Heard fled a gas station and led police on a
high-speed chase before driving into a field and taking off on foot.  Corporal Curtis Boone, one of the officers
who arrived at the field, testified that Renae told him then that Heard would
kill a police officer.  A Secret Service
agent who talked to Diane and Renae also testified that Diane said Heard was
dangerous and Asomebody would possibly die@ in the
end.  Mike testified that on the day of
the shooting, Diane and Renae told Heard that the officers had asked them
questions about the computer equipment found in Heard=s truck.  








The jury heard extensive testimony regarding what
Heard may have heard when the officers approached the trailer based on Heard=s
location and the build and layout of the trailer.  Mike testified that after he answered the
door to Officer Tamayo, he called for Renae, saying, A[T]he
police are here.  They want to see you.@  Mike further testified that Renae also said
the police were there, which he found strange because he had just told her
that.  Officer Myers testified that he
too found it strange because Mike was seated only about six feet away in the
living room.  During these exchanges,
Heard was in the middle bedroom.   Mike testified that the door to the middle
bedroom is about an arm=s reach back from the front
doorway.  He explained that the trailer
was a small, older model trailer and that the inside walls were constructed
with very thin paneling and did not have any insulation.  He testified that someone paying attention
could figure out anything going on in the trailer from any room.  The State read in front of the jury the
following portion of one of Mike=s
statements made after the shooting: A[Heard]
maybe could have heard when the officer told me he was the police, but when
Renae came in and said they were going to search the place, she said it loud enough
that [Heard] could have heard it in the bedroom; the doors in the trailer are
hollow and thinner than pressed board.@  Diane=s mother
testified that if she were in her room (located on the far east side of the
trailer), she could hear music being played in Diane=s room
(located on the far west side of the trailer). 
The jury saw a diagram of the layout of the trailer, multiple
photographs of the inside of the trailer, and a piece of the trailer=s
interior wall.  








The jury heard extensive testimony about what the
police officers wore to identify themselves as police officers on the day of the
shooting and whether Heard could have seen the officers from his position in
the middle bedroom.  Mike testified that
when he answered the door, he could tell that Officer Tamayo was wearing a
bulletproof police vest under the work shirt. 
A man who lived across the street also testified that he saw an unmarked
car pull up to the trailer and an officer get out of the car.  He testified, @And
obviously, it was an officer.  He had his
gun in open display, and he had his vest on.@  When Officer Nava pushed open the door to the
middle bedroom, Officer Tamayo was wearing his police sweatshirt and police
tactical vest and Officer Nava was wearing his duty belt with his badge on it.  The jury saw photographs of these items.  Edward Hueske, a crime reconstruction expert
for the State, explained that someone at the foot of the bed in the middle
bedroom could see the badges the officers wore while standing in the doorway to
the bedroomCwhere Officer Nava stood when
Heard shot him.  

Both Officer Tamayo and Officer Myers testified
that after Officer Nava was shot and after Officer Myers yelled, AOfficer
down,@ Heard
continued firing shots from the middle bedroom. 
An officer who arrived at the trailer shortly after the shooting
testified that Renae said that they saw the officers approaching the trailer
and that Heard threatened to kill her if she let the officers inside the
trailer, accused her of Asnitching@ on him
by telling the police that he was in the trailer, and said he would be
listening.  








Despite the above evidence, Heard argues that
because the State did not conduct sound testing in the trailer to determine
whether Heard could have heard the police when they entered the trailer and
because Heard=s shot pattern was Achaotic,@ a
rational juror could not have found beyond a reasonable doubt that Heard knew
Officer Nava was a police officer when he shot him.  The detectives and the prosecutor discussed
whether to conduct acoustical testing in the trailer and decided against it because
they would not be able to duplicate certain noise factors such as the volume of
the TV, the voices, and the air conditioner. 
Defense expert Max Courtney testified that he conducted experimentsCnot
scientific in natureCin the trailer to determine Awhat a
reasonable person might be able to hear@ from
inside the middle bedroom with the air conditioner blowing; he determined that
people could not hear conversations outside of the bedroom with the air
conditioner on high.  On
cross-examination, Courtney testified that he could be a little hard of hearing
and agreed that it is possible that someone who knew the police were looking
for him would have a heightened awareness of what was going on.  

The evidence showed that Heard fired ten shotsCsome
through the ceiling of the bedroom, some through the air conditioner, and some
through the wall toward the officers. 
Courtney testified that two of Heard=s shots
were directed toward the doorway, and a State crime reconstruction expert
opined that the distance from Heard to Officer Nava and the way the bullet hit
Officer Nava indicated that Athe
shooter was intending to hit the target.@  








Contrary to Heard=s
assertions, a rational juror could have found, based on the evidence presented
at trial, that Heard knew the police were looking for him,  said he would kill a police officer, saw the
police officers approaching the trailer, heard Mike and Renae say the police
were there, saw that the men were police officers, and continued shooting after
Officer Myers said an officer was down. 
Based on this evidence, a rational jury could have found beyond a
reasonable doubt that Heard knew that Officer Nava was a peace officer when he
shot him.  See Tex. Penal Code
Ann. ' 19.03(a)(1);  Jackson, 443 U.S. at 319, 99 S. Ct. at
2789; Escamilla v. State, 143 S.W.3d 814, 820B21 (Tex.
Crim. App. 2004).  After reviewing the
evidence in the light most favorable to the verdict and giving full play to the
responsibility of the jury to weigh the evidence and draw reasonable inferences
from basic facts to ultimate facts, we hold that a rational trier of fact could
have found beyond a reasonable doubt that Heard committed capital murder.  See Tex. Penal Code Ann. ' 19.03(a)(1);  Jackson, 443 U.S. at 319, 99 S. Ct. at
2789.  Because the evidence is legally
sufficient to support the jury=s
verdict, we overrule Heard=s sole
point.

IV. Conclusion

Having overruled Heard=s sole
point, we affirm the trial court=s
judgment.

 

SUE WALKER

JUSTICE

 

PANEL:
LIVINGSTON, DAUPHINOT, and WALKER, JJ.

PUBLISH

 

DELIVERED: January 8, 2009                                        

 











[1]A Ablue warrant@ is an arrest warrant
issued when a parolee has been suspected of violating the conditions of his
probation.  See Blaylock v. State,
259 S.W.3d 202, 209 n.2 (Tex. App.CTexarkana 2008, pet. ref=d).





[2]Officer Myers testified
that officers in his unit would often wear work shirts over their uniforms when
serving blue warrants because people with outstanding warrants are less likely
to answer the door to a police officer. 
Officer Myers also explained that a person standing within three to four
feet of an officer wearing this type of disguise could tell that the person was
a police officer.